## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.I.B.C. PARTNERS, L.P., | : | |
| T.I.B.C. PARTNERS, LP, | : | CIVIL ACTION |
| T.I.B. PARTNERS, LP, | : | |
| T.I.B.C. BAY PARTNERS, LP | : | |
| vs. | : | |
| THE CITY OF CHESTER, | : | |
| JOHN A. LINDER, Mayor | : | |
| JOSEPH BAIL, JR., Police | : | NO. 14-CV-03697 |
| Commissioner, KEYSTONE | : | |
| SPORTS AND ENTERTAINMENTS, LLC, | : | |
| FC PENNSYLVANIA STADIUM LLC, | : | |
| PENNSYLVANIA PROFESSIONAL | : | |
| SOCCER, LLC, GLOBAL SPECTRUM, INC., | : | |
| DAVID P. DEBUSSCHERE AND MICHAEL | : | |
| SCANLON | : | |

### ORDER

AND NOW on this _____ day of _____, 2014, upon consideration

of the Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) of defendants, John

A. Linder and City of Chester, and any responses thereto, it is hereby ORDERED and DECREED

that the Motion is GRANTED, and all claims against defendants, John A. Linder and City of Chester

are DISMISSED WITH PREJUDICE.

**BY THE COURT:**

_____

**Hon. Edmund V. Ludwig, U.S.D.J.**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.I.B.C. PARTNERS, L.P., | : | |
| T.I.B.C.  PARTNERS, LP, | : | CIVIL ACTION |
| T.I.B. PARTNERS, LP, | : | |
| T.I.B.C. BAY PARTNERS, LP | : | |
| vs. | : | |
| THE CITY OF CHESTER, | : | |
| JOHN A. LINDER, Mayor | : | |
| JOSEPH BAIL, JR., Police | : | NO. 14-CV-03697 |
| Commissioner, KEYSTONE | : | |
| SPORTS AND ENTERTAINMENTS, LLC, | : | |
| FC PENNSYLVANIA STADIUM LLC, | : | |
| PENNSYLVANIA PROFESSIONAL | : | |
| SOCCER, LLC, GLOBAL SPECTRUM, INC., | : | |
| DAVID P. DEBUSSCHERE AND MICHAEL | : | |
| SCANLON | : | |

### MOTION TO DISMISS PURSUANT TO FED. R. CIV. PRO. 12(b)(6) ON
### BEHALF OF DEFENDANTS, CITY OF CHESTER AND JOHN A. LINDER

Defendants, City of Chester and John A. Linder, by and through their attorneys, Bennett,

Bricklin & Saltzburg LLC, move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss

plaintiffs' claims with prejudice, and aver as follows in support of their motion:

1.      In this case, plaintiffs seek to convert an admittedly complicated zoning and land use

dispute with the City of Chester and the private defendants into federal RICO and civil rights claims.

Plaintiffs' claims are predicated on the presence of an imagined conspiracy, pled in conclusory form,

to deprive plaintiffs of their land so that it could be purchased by the private defendants. Plaintiffs,

however, have failed to state any claim upon which relief may be granted.

2.      Initially, all of plaintiffs' claims against Mayor Linder and the City of Chester must

be dismissed because they have failed to plausibly plead the presence of a conspiracy to deprive them

of their property, and instead offer only unsupported conclusions. Since the alleged conspiracy is

at the heart of all of the allegations, all claims must be dismissed.

3.      Additionally, plaintiffs' civil RICO claim must be dismissed because plaintiffs have failed to plead a pattern of predicate acts necessary to make out a RICO cause of action, and have failed to plead the existence of a RICO enterprise. Plaintiffs' section 1983 claims must be dismissed because plaintiffs have failed to plead violations of their procedural or substantive due process rights under the Fourteenth Amendment, or their right to just compensation for a "taking" under the Fifth Amendment. Plaintiffs have further failed to allege that any claimed constitutional violation was caused by a policy or custom of the City of Chester.

4.      Plaintiffs' common law claims against Mayor Linder must be dismissed because he is a high public official entitled to absolute immunity from all state causes of action. Moreover, plaintiffs have failed to plead the existence of common law fraud, and all other state law claims presuppose the presence of Mayor Linder's involvement in a conspiracy, which has not been sufficiently pled.

5.      Alternatively, if plaintiffs have pled viable causes of action against the City of Chester, all claims for RICO treble damages and punitive damages against the City must be dismissed, because plaintiffs do not assert a RICO claim against the City, and the City cannot be liable for punitive damages under both section 1983 and the common law.

6.      Finally, if plaintiffs have pled viable causes of action, moving defendants seek a more definite statement reciting: (1) the dates upon which closures were allegedly made on each of plaintiffs' properties; (2) the specific properties on which the closures were made on each date; (3) the manner in which plaintiffs contend they gained the right to operate public parking lots on each of their discrete properties; and (4) the dates upon which they claim to have obtained those rights for each property.

WHEREFORE, defendants, City of Chester and John A. Linder, respectfully request that their motion be GRANTED, and that all claims against them be DISMISSED WITH PREJUDICE.

Respectfully submitted,

**BENNETT, BRICKLIN & SALTZBURG LLC**

BY: _____

EDWARD J. BRADLEY, JR.
NICHOLAS A. CUMMINS
Identification Nos. 73943 / 203238
1601 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 561-4300
bradley@bbs-law.com / cummins@bbs-law.com
Attorneys for defendants, The City of Chester and
Mayor John A. Linder

Date:   September 9, 2014

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.I.B.C. PARTNERS, L.P., | : | |
| T.I.B.C. PARTNERS, LP, | : | CIVIL ACTION |
| T.I.B. PARTNERS, LP, | : | |
| T.I.B.C. BAY PARTNERS, LP | : | |
| vs. | : | |
| THE CITY OF CHESTER, | : | |
| JOHN A. LINDER, Mayor | : | |
| JOSEPH BAIL, JR., Police | : | NO. 14-CV-03697 |
| Commissioner, KEYSTONE | : | |
| SPORTS AND ENTERTAINMENTS, LLC, | : | |
| FC PENNSYLVANIA STADIUM LLC, | : | |
| PENNSYLVANIA PROFESSIONAL | : | |
| SOCCER, LLC, GLOBAL SPECTRUM, INC., | : | |
| DAVID P. DEBUSSCHERE AND MICHAEL | : | |
| SCANLON | : | |

## BRIEF IN SUPPORT OF MOTION TO DISMISS ON BEHALF
## OF DEFENDANTS, CITY OF CHESTER AND JOHN A. LINDER

BENNETT, BRICKLIN & SALTZBURG LLC
EDWARD J. BRADLEY, JR.
NICHOLAS A. CUMMINS
Identification Nos. 73943 / 203238
1601 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 561-4300
bradley@bbs-law.com/cummins@bbs-law.com
Attorneys for defendants, The City of Chester and
Mayor John A. Linder

Date:   September 9, 2013

# TABLE OF CONTENTS

I.      **SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     **FACTUAL OVERVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    **LEGAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.   **Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.   **Plaintiffs Have Failed to Plausibly Plead the Existence of a Conspiracy Involving Mayor Linder and the City of Chester.** . . . . . . . . . . . . . . . . . . 13

    C.   **Plaintiffs' RICO Claims Against Mayor Linder Must be Dismissed.** . . . . . . . . 22

        1.   ***Plaintiffs do not Allege Predicate Acts Sufficient to Constitute Racketeering Activity within the Meaning of the RICO Statute.*** . . . . . . . 25

            a.   **Plaintiffs' Complaint Fails to Set Forth Facts Sufficient to Establish an Attempt to Defraud.** . . . . . . . . . . . . . . . . . . . . . . . 26

            b.   **Plaintiffs' Complaint Fails to Set Forth Facts Demonstrating Reasonable Reliance on the Alleged Scheme to Defraud.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            c.   **Plaintiffs Set Forth No Facts Implicating Mayor Linder in an Alleged Scheme to Bribe Members of the Chester Police Department.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        2.   ***Plaintiffs do not Allege a Pattern of Racketeering Activity Sufficient to Establish a RICO Cause of Action.*** . . . . . . . . . . . . . . . . . . . . . . . 30

            a.   **Plaintiffs Fail to Establish Continuity over a Closed Period.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            b.   **Plaintiffs Fail to Establish Continuity Over an Open-Ended Period of Time.** . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        3.   ***Plaintiffs do not Allege the Existence of a RICO Enterprise.*** . . . . . . . . . 33

        4.   ***Plaintiffs Fail to Sufficiently Plead Facts Under Rule 9(b).*** . . . . . . . . . . 35

    D.   **Plaintiffs' Section 1983 Civil Rights Claims Against Mayor Linder and the City of Chester Must be Dismissed.** . . . . . . . . . . . . . . . . . . . . . . . . . . 37

1.   ***Plaintiffs Have Failed to Allege a Violation of Their Fourteenth Amendment Due Process Rights.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    a.   **Plaintiffs Have Failed to State a Procedural Due Process Violation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        i.   ***Plaintiffs Have Not Pled a Protected Property Interest.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        ii.   ***Plaintiffs Have Failed to Allege a Due Process Violation Based on the Failure to Provide a Pre-Deprivation Hearing.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        iii.   ***Plaintiffs Have Failed to Plead a Violation of Their Rights to Post-Deprivation Procedural Due Process.*** . . . . 47

    b.   **Plaintiffs Have Failed to State a Substantive Due Process Violation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

2.   ***Plaintiffs Have Failed to Allege a Violation of their Fifth Amendment Rights.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

3.   ***Plaintiffs Have Failed to Plead a Viable "Monell" Claim for Municipal Liability Against the City of Chester.*** . . . . . . . . . . . . . . . . . . . 54

E.   **Plaintiff's State Law Claims Against Mayor Linder Must Be Dismissed.** . . . . 58

    1.   ***As a High Public Official, Mayor Linder is Absolutely Immune from Suit on All State Law Causes of Action Alleged Against Him.*** . . . . 58

    2.   ***Plaintiffs Have Failed to Allege Common Law Fraud.*** . . . . . . . . . . . . . . 61

    3.   ***Plaintiffs Claims for Civil Conspiracy, Trespassing, and Intentional Interference with Contractual Relations Must be Dismissed.*** . . . . . . . . . 62

F.   **Alternatively, All Punitive Damages and RICO Treble Damage Claims Against the City of Chester Must be Dismissed.** . . . . . . . . . . . . . . . . . . . . . . . . . 63

G.   **Alternative Motion for More Definite Statement Pursuant to Federal Rule of Civil Procedure 12(e).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

IV.   **CONCLUSIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Defendants, City of Chester and John A. Linder, by and through their attorneys, Bennett, Bricklin & Saltzburg LLC, move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss plaintiffs' claims with prejudice, and submit this brief in support of their motion.

## I.   **SUMMARY OF ARGUMENT**

In this case, plaintiffs seek to convert an admittedly complicated zoning and land use dispute with the City of Chester and the private defendants into federal RICO and civil rights claims. Plaintiffs' claims are predicated on the presence of an imagined conspiracy, pled in conclusory form, to deprive plaintiffs of their land so that it could be purchased by the private defendants. Plaintiffs, however, have failed to state any claim upon which relief may be granted.

Initially, all of plaintiffs' claims against Mayor Linder and the City of Chester must be dismissed because they have failed to plausibly plead the presence of a conspiracy to deprive them of their property, and instead offer only unsupported conclusions. Since the alleged conspiracy is at the heart of all of the allegations, all claims must be dismissed.

Additionally, plaintiffs' civil RICO claim must be dismissed because plaintiffs have failed to plead a pattern of predicate acts necessary to make out a RICO cause of action, and have failed to plead the existence of a RICO enterprise. Plaintiffs' section 1983 claims must be dismissed because plaintiffs have failed to plead violations of their procedural or substantive due process rights under the Fourteenth Amendment, or their right to just compensation for a "taking" under the Fifth Amendment. Plaintiffs have further failed to allege that any claimed constitutional violation was caused by a policy or custom of the City of Chester.

Plaintiffs' common law claims against Mayor Linder must be dismissed because he is a high public official entitled to absolute immunity for all state causes of action. Moreover, plaintiffs have

failed to plead the existence of common law fraud, and all other state law claims presuppose the presence of Mayor Linder's involvement in a conspiracy, which has not been sufficiently pled.

Alternatively, if plaintiffs have pled viable causes of action against the City of Chester, all claims for RICO treble damages and punitive damages against the City must be dismissed, because plaintiffs do not assert a RICO claim against the City, and the City cannot be liable for punitive damages under both section 1983 and the common law.

Finally, if plaintiffs have pled viable causes of action, moving defendants seek a more definite statement reciting: (1) the dates upon which closures were allegedly made on each of plaintiffs' properties; (2) the specific properties on which the closures were made on each date; (3) the manner in which plaintiffs contend they gained the right to operate public parking lots on each of their discrete properties; and (4) the dates upon which they claim to have obtained those rights for each property.

## II.    **FACTUAL OVERVIEW**

On July 16, 2014, plaintiffs commenced this action seeking to elevate an underlying zoning and parking enforcement dispute between plaintiffs, the City of Chester, and various entities associated with a sports stadium in the City of Chester, to a claim for racketeering and civil rights violations. See Exhibit A, Complaint. The suit stems from the efforts of the plaintiffs to use their property for public parking during sporting events, despite the fact that their properties were not zoned for public parking at the time they purchased the land.

According to the complaint, the plaintiffs are record owners of several parcels of land[1]

---

[1]TIBC Partners, LP owns 104-117 Reaney Street. TIBC Depot Partners, LP owns 12 Reaney Street and 19 Reaney Street. TIBC Bay Partners owns 1917-1923 West Second Street and Lot 860 001. TIB Partners, LP was the owner of 126-134 Reaney Street until November 2013, when the property was transferred to TIBC Bay Partners. Exhibit

adjacent to PPL Park stadium, which is located in the City of Chester, and home to the Philadelphia Union professional soccer team. Exhibit A at ¶¶ 1-11. The Philadelphia Union soccer team began playing their home matches at PPL Park in 2010. Exhibit A at ¶ 11. Plaintiffs purchased their properties the following year, on December 20, 2011. Id. at ¶ 18. Plaintiffs admit that their properties were not zoned for public parking at the time of their purchase[2]. Id. at ¶ 20.

On January 17, 2012, plaintiffs filed an application for a variance, which would permit public parking on their land. Exhibit A at ¶ 20. The first day of hearings on the application was held on February 16, 2012. Id. at ¶ 21. After the first day of hearings, on March 14, 2012, the City of Chester and plaintiffs entered into an agreement, under which plaintiffs were issued "temporary Off-Street Parking Permits for the calendar year 2012." Id. at ¶ 23. In exchange, plaintiffs agreed to postpone their variance applications. Id. The agreement also stipulated that "the issuance of temporary off-street parking permits by the City of Chester **shall not be used or entered in any current or future proceedings of any kind for any reason**." See Temporary Parking Permit Agreement, Attached to Plaintiff's Complaint as Exhibit B. The agreement was signed by defendant, John A. Linder, the Mayor of the City of Chester. "In reliance on the written agreement," plaintiffs then cleared trash and debris from the parcels, and used them for parking on March 14 and 18, 2012. Exhibit A at ¶ 24.

On April 26, 2012, plaintiffs allege that Mayor Linder and Chester Police Commissioner,

---

A at ¶¶ 1-4.

[2]By way of background, when the stadium was constructed, the parking lots associated with the stadium were zoned for public parking. Likewise, zoning permitted owners of existing structures with parking lots in Chester to allow public parking in those lots, provided they obtained a permit from the City. The area immediately around the stadium, however, which encompasses plaintiffs' parking lots, was not zoned for parking. This was done in the hope that the area around the stadium would be developed into restaurants, shops, or hotels, which was seen as a more beneficial use of the land than vast expanses of open parking lots.

defendant, Joseph Bail, Jr., "caused" Chester employee, William Payne, to issue a Cease and Desist Order[3] to the plaintiffs. Exhibit A at ¶ 26. Plaintiffs allege that at the time the Cease and Desist Order was issued, Commissioner Bail was a "W-2 employee" of defendant, Global Spectrum. Exhibit A at ¶ 27. According to the complaint, Global Spectrum provided management services to the defendants that operate PPL Park and the Philadelphia Union soccer team (Stadium Defendants)[4]. Exhibit A at ¶ 11. Plaintiffs allege that Commissioner Bail and each of his "three top police department officers" were paid four hundred dollars for each event held at PPL Park. Id. at ¶ 27. Plaintiffs claim that the Cease and Desist Order was issued "at the request and under the direction of" defendants, Michael Scanlon (General Manager of Global Spectrum), David Debusschere (Executive Vice President of "Stadium Defendants"), Global Spectrum and the Stadium Defendants.

The Cease and Desist Order did not purport to revoke the temporary parking permits issued to plaintiffs, but instead advised plaintiffs that they had failed to comply with the conditions for operating under such a permit. The Cease and Desist Order stated:

> The parking lots that you operate pursuant to a Temporary Permit are in violation of the requirements of Section 1370-A.05(b) of the Chester Zoning Ordinance. "Every temporary parking lot shall require a Temporary Permit subject to the conditions that the use be conducted **in a manner consistent with public safety** and all traffic laws." The Chester City Police Department has determined that the manner in which you have operated the parking lots **poses a significant danger to public safety**.

See Cease and Desist Order attached to Plaintiff's Complaint as Exhibit C (emphasis added). The Cease and Desist order cited a lack of sidewalks, false and misleading signs erected by plaintiffs, and excessively aggressive parking attendants. Id. The order directed plaintiffs to immediately stop

---

[3]The document is actually a "Notice of Violation;" however, defendants maintain the terminology used by plaintiffs for the sake of clarity.

[4]Plaintiffs allege that defendants, Keystone Sports & Entertainment LLC, FC Pennsylvania Stadium LLC, and Pennsylvania Professional Soccer LLC own and operate the stadium and the Philadelphia Union. Exhibit A at ¶¶ 8-11.

4

using "Lots 1 and 2," and advised that their continued use of "the remaining lots" was subject to the conditions that they stopped using signs to direct traffic to their lots, and that the parking attendants stop speaking to vehicle operators until the vehicles had entered the lots. Id. Plaintiffs' complaint does not identify which of their properties constituted "Lots 1 and 2."

Plaintiffs allege that the direction to close two of their lots without first holding a court hearing was a violation of their Due Process rights. Exhibit A at ¶¶ 33-34. Plaintiffs filed an appeal of the Cease and Desist Order with the Zoning Hearing Board on the day the Cease and Desist Order was served. Exhibit A at ¶ 31. Plaintiffs allege that the appeal operated as an automatic stay of the Cease and Desist Order. Id. at ¶ 36. As a result, plaintiffs opened their lots on May 13, May 29, and June 3, 2012. Id. at ¶ 36.

On June 7, 2012, William Payne issued a second Notice of Violation to the plaintiffs. Exhibit A at ¶ 37. Unlike the original Cease and Desist Order, which advised plaintiffs that they were not complying with the conditions for a temporary parking permit, the June Notice of Violation advised plaintiffs that their temporary parking permits were null and void, because temporary parking permits are not permitted in areas not zoned for public parking. Exhibit A at ¶ 37. It advised plaintiffs:

> [T]he Lots are in the W-1 Waterfront Development District and the M-3 Industrial District. These Districts are not part of the Overlay Parking District authorized by the City's Zoning Ordinance. Any permits or agreements providing for temporary parking on the Lots are not authorized by the Zoning Ordinance and are therefore null and void.

See June Notice of Violation attached to Plaintiff's Complaint as Exhibit E. In other words, the City advised that it was without authority to issue the temporary parking permit provided under the January 2012 agreement, because temporary parking permits cannot be issued unless the lots are

zoned for public parking. The June Notice of Violation informed plaintiffs that if they wished to use the lots for public parking, "then you must apply for and obtain a variance from the Zoning Hearing Board." Id. Otherwise, plaintiffs were directed to cease operation of the lots. Id.

Plaintiffs allege, in conclusory fashion, that Mayor Linder and Commissioner Bail instructed William Payne to issued the June Notice of Violation "in furtherance of the Defendants' RICO enterprise and at the express direction" of Michael Scanlon, David Debusschere, Global Spectrum and the Stadium Defendants. Exhibit A at 37. Plaintiffs allege that the issuance of the June Notice of Violation was "illegal" in light of the January agreement issuing the temporary parking permit, and the pending appeal from the April Cease and Desist Order. Id. at 38. Plaintiffs allege in conclusory fashion that the June Notice of Violation was issued to "prevent Plaintiffs from competing for customers with Defendants and to eventually force the Plaintiffs' business out of Chester so that... Scanlon..., Debusschere, and their Defendant business corporations could obtain Plaintiffs' business property for less than the fair market value." Id. at ¶ 38.

After the June Notice of Violation was issued, plaintiffs allege that "the Defendants caused Chester City police officers to close Plaintiffs' parking lots by blockading them with City owned trucks and wooden barricades." Exhibit A at ¶ 39. Plaintiffs do not allege the dates of these closures, and do not identify which of its lots were closed on these unspecified dates. Plaintiffs allege that this conduct violated their Due Process rights and rights under the Pennsylvania constitution, and that these actions were taken "solely for the purpose of disrupting and injuring the Plaintiff's business...." Id.

On June 12, 2012, the City of Chester and plaintiffs entered into a Stipulated Order, which

addressed the pending dispute[5]. Exhibit A at ¶¶ 40-41.  Under the order, the City agreed to lift the

June Notice of Violation, and allow plaintiffs to continue to operate their lots under the temporary

parking permit. See Stipulated Order Attached to Plaintiffs' Complaint as Exhibit F.  The plaintiffs

were to then reinstate their original variance applications, and combine that matter with the pending

appeal of the April Cease and Desist Order.  Id.  Thus, the Stipulated Order resolved any issues

created by the June Notice of Violation.  Significantly, the Stipulated Order also released the City

of Chester and its employees from any liability arising out of the dispute.  It provided:

> Plaintiffs hereby do remise, release, and forever discharge the City of Chester, its
> officers, agents... from any and all manner of actions and causes of action... and
> demands whatsoever in law or equity in any way relating to the Agreement dated
> March 14, 2012 between the Plaintiffs and the City... from the beginning of the world
> to the date of this Stipulated Order.

Id.  Thus, **plaintiffs discharged the City and its employees from all liability for any actions that**

**they had taken through June 12, 2012**.

Plaintiffs' complaint makes no reference to the further zoning proceedings contemplated in

the stipulated order.  However, plaintiffs continued to operate their parking lots from June 12, 2012

to October 1, 2012.  Exhibit A at ¶ 42.  On October 16, 2012, plaintiffs filed a declaratory judgment

complaint, seeking a determination that they were entitled to park vehicles at "Lots A and B" due

to the presence of a prior non-conforming use of the parcels.  Id. at ¶ 43.  The complaint does not

allege that a similar declaration was sought for plaintiffs' other parcels.

While the declaratory judgment was pending, on March 2, March 16, April 13, and May 4,

---

[5]The only litigation identified in the complaint is the appeal of the June Notice of Violation to the Zoning
Hearing Board.  The stipulated order was issued by the Court of Common Pleas of Delaware County at docket number
2012-004876.  A search of the public dockets shows that this was an action filed by plaintiffs for "specific performance
and establishment of vested right in 2012 parking permit."  This proceeding is not referenced in the complaint.

2013, plaintiffs allege that members of the Chester Police "illegally close[d] the Plaintiffs' parking lots by blocking streets with Chester City Street Department vehicles and cordoning off the entrances to the lots" with yellow "CRIME SCENE" tape. Exhibit A at ¶ 46. Plaintiffs do not state which lots were subject to the closures. By its terms, **the temporary parking permit, effective "for the calendar year 2012," had expired, and plaintiffs do not plead that any other ordinance, variance or agreement permitted the use of these lots for public parking in March, April or May of 2013**. Thus, the complaint is devoid of any facts suggesting that plaintiffs had a right to use any of the allegedly closed lots for public parking.

Plaintiffs allege in conclusory fashion that it was David Debusschere and Michael Scanlon who "caused their employee," Commissioner Bail, to have the police close plaintiffs' parking lots in March and April of 2013. See Exhibit A at ¶ 46. Plaintiffs also allege that Michael Scanlon personally placed some of the barriers across plaintiffs' parking lots. Id. In addition, plaintiffs cite to two letters from March 13 and 20, 2013 sent by David Debusschere to Mayor Linder, Commissioner Bail, and Chester City Counsel. Id. at ¶¶ 47-48. The letters generally thank the City for its parking enforcement efforts, complain about continued unpermitted parking in some lots, and request continued enforcement of the parking zoning and permitting requirements. Id.

Following the closures in March, April and May 2013, plaintiffs sought and obtained a *preliminary* injunction in the pending declaratory judgment action on May 13, 2013. Exhibit A at ¶¶ 50-53. The order provided that the City of Chester was to "cease and desist from interfering in any fashion with the Plaintiffs' lawful operation of their parking facilities both prior to and after events at PPL Park, including but not limited to interfering in any fashion with both the entrances and exits from those facilities until further Order of this Court." See Preliminary Injunction Order

8

Attached to Plaintiffs' Complaint as Exhibit L.  Also after these closures, on May 20, 2013, the Court of Common Pleas affirmed a variance of an unspecified date permitting plaintiffs to operate parking facilities "at three parcels of land located in the City of Chester."  Exhibit A at ¶ 55. Plaintiffs' complaint does not state which parcels of land were subject to the variance, and fails to plead that closures were carried out at any of the three parcels for which a variance had been granted.

In the interim, the Stadium Defendants, who had intervened in the declaratory judgment action, appealed the preliminary injunction.  Exhibit A at ¶ 54.  While that appeal was pending, however, the declaratory judgment action was settled and discontinued on January 14, 2014.  Id. at ¶¶ 54.  Under the settlement, the City of Chester agreed to withdraw from participation in the declaratory judgment action, as well as three other matters pending in the courts[6], and withdraw its appeal of the pending preliminary injunction.  See Order and Settlement Agreement Attached to Plaintiffs' Complaint as Exhibit M.  In exchange, plaintiffs agreed not to "cite, rely upon or in anyway used as precedent against the City of Chester the final determinations of the [pending] matters," and that the "the injunction order on May 13, 2013 shall be dissolved."  Id.  Pursuant to the settlement agreement, on January 13, 2014, the Delaware County Court of Common Pleas **dissolved the injunction issued on May 13, 2013**[7].  Id.  Plaintiffs' complaint does not mention that the injunction was dissolved, although its dissolution is set out in the order attached to its complaint.

On March 15, 2014, three months after the injunction was dissolved, plaintiffs allege that Commissioner Bail directed Chester Police officers to barricade every exit and parking row on

---

[6]Keystone Sports and Entertainment LLC et al. v. City of Chester Zoning Hearing Board, et al., No. 12-8718; Appeal of TIBC Partners, Zoning Hearing Board City of Chester, No. 2013-010626; and Keystone Sports and Entertainment LLC et al. v. City of Chester Zoning Hearing Board, No. 2013-011616.

[7]"...[I]t is hereby ORDERED, ADJUDGED and DECREED that the Injunction issued in the above captioned matter BE and he same is hereby DISSOLVED."

plaintiffs' property with wooden saw horses and yellow "CRIME SCENE" tape. Exhibit A at ¶ 56. In what can be generously described as an "error," plaintiffs allege that this action was taken "[d]espite the existence of the Order of May 13, 2013, prohibiting any interference with access to or from the Plaintiffs' lots...." Id. at 55. As noted, **the May 13, 2013 injunction had been dissolved three months earlier**. Plaintiffs' complaint does not identify the parcels at which the closures were made, and fails to allege that the closures took place at any of the lots for which a variance or other right to operate a parking facility had been granted. Plaintiffs allege that at the time Commissioner Bail gave the order to close the unspecified lots, he was a "W-2 employee" of Global Spectrum.

Plaintiffs allege that all defendants entered into an "illegal conspiracy" to interfere with plaintiffs' contractual relations and their patrons "to such an extent that the patrons would never again park on Plaintiffs' lots." Exhibit A at ¶ 57. The alleged purpose of this conspiracy was "to obtain Plaintiffs' patrons for themselves and to eventually obtain Plaintiffs' property for themselves at a fraction of its value." Id. The sum total of plaintiffs' alleged "evidence" of such a conspiracy is that Commissioner Bail and three other "top police officers" were paid four hundred dollars per event to enforce order at the stadium, and the two letters sent by David Debusschere in March 2013, thanking the City for its parking and safety enforcement efforts, and requesting additional enforcement.

Plaintiffs allege that in carrying out the supposed conspiracy, Commissioner Bail filed Statements of Financial Interest for 2012 and 2013 that "did not list his employment income" from Global Spectrum, "so as to be able to secretly continue to further the interests of the Defendants'

unlawful enterprise[8]." Exhibit A at ¶ 59.  Plaintiffs allege that Commissioner Bail's alleged failure to disclose this income is a misdemeanor offense under Pennsylvania's Public Official and Employee Ethics Act ("Ethics Act").  Id. at ¶ 61; 65 Pa. Cons. Stat. Ann. § 1109(b).  Plaintiffs also allege that Commissioner Bail committed a felony punishable by up to five years in prison by allegedly engaging in conduct that constitutes a conflict of interest, and allegedly accepting something of monetary value in exchange for influence over his decisions.  Id. at ¶¶ 62-63; 65 Pa. Cons. Stat. Ann. §§ 1109(a, c).  Last, plaintiffs' allege the Commissioner Bail's alleged acceptance of employment from Global Spectrum violated the provisions of Pennsylvania's Third Class City Code, which prohibits a police officer from accepting compensation for his services as a police officer, other than as provided by ordinance.  Exhibit A at ¶ 63; 53 P.S. § 37008.  Of these items, plaintiffs claim only the alleged felony as a RICO "predicate act."  Id. at ¶ 63.

Plaintiffs allege that Michael Scanlon and Global Spectrum violated the Ethics Act by "seeking improper influence" over Commissioner Bail by allegedly paying him four hundred dollars per event.  Exhibit A at ¶ 65.  Plaintiffs allege that Scanlon and Global Spectrum did so at the direction of David Debusschere and the Stadium Defendants.  Id.  Relatedly, plaintiffs allege that "Defendants" use of the "U.S. mail and interstate wires" to pay Commissioner Bail and his three "top officers" as "undisclosed employees" is a felony under the Ethics Act.  Id. at 66; 65 Pa. Cons. Stat. Ann. § 1109(a).  In addition, plaintiffs allege that this conduct constituted the Federal crimes of mail fraud, bribery, and wire fraud, as well as violations of the Chester Home Rule Charter, the Municipalities Planning Code, and plaintiffs' Due Process Rights under the state and Federal

---

[8]As an aside, if the payments to Commissioner Bail were intended to be "secret bribes" for influence over him, one must wonder why those "secret" payments were reported on W-2s provided to the Internal Revenue Service.

constitutions. Id. at ¶ 67. Plaintiffs do not allege that Mayor Linder violated any law.

Count I of plaintiffs' complaint asserts a cause of action against all defendants *except the City of Chester* under the Racketeer Influenced and Corrupt Organizations Act. Exhibit A at ¶¶ 69-88. Count II asserts violations of 42 U.S.C.A. § 1983 against all defendants based on the defendants' alleged violation of plaintiffs' Fifth and Fourteenth Amendment rights "by illegally depriving Plaintiffs of the lawful use of their business property without due process of law." Id. at ¶¶89-102. Count III seeks counsel fees for the purported Civil Rights violations under 42 U.S.C.A. § 1988. Counts IV through VII assert state law claims for Civil Conspiracy, Fraud, Trespass, and Intentional Interference with Contractual Relations, respectively, against all defendants *except* the City of Chester. Id. at ¶¶ 105-117. Thus, the only claim against the City of Chester is under section 1983.

Plaintiffs demand compensatory damages, punitive damages, counsel fees, and treble damages under RICO from all defendants. Exhibit A at ¶ 118. Plaintiffs also seek injunctive relief against the City of Chester only. Id.

## III.    **LEGAL ARGUMENT**

### A.      **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for the dismissal of a claim for the "failure to state a claim for which relief can be granted" through a pre-pleading motion. Fed. R. Civ. Pro. 12(b)(6). To survive a motion to dismiss, a complaint must allege facts that adequately set forth each of the essential elements of a cause of action. Nami v. Fauver, 82 F.3d 63, 65 (3rd Cir. 1996). Although the Court must accept all well-pleaded factual allegations contained in the complaint, it need not credit bare allegations, conclusory assertions or unwarranted factual inferences. Maio v. Aetna, Inc., 221 F.3d 472, 485 n.12 (3d Cir. 2000); Morse v. Lower Merion

School District, 132 F.3d 902, 906 (3d Cir. 1997); Kost v. Kozakiewwicz, 1 F.3d 176, 183 (3d Cir.

1993); Perry v. Grant, 775 F.Supp. 821 (M.D. Pa. 1991). Bald assertions and conclusions of law will

similarly not survive a motion to dismiss. Gardiner v. Mercyhurst College, 942 F.Supp. 1050, 1052

(M.D. Pa. 1995). In short, the complaint's "[f]actual allegations **must be enough to raise a right**

**to relief above the speculative level**..., on the assumption that all the allegations in the complaint

are true (even if doubtful in fact)...." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct.

1955, 1964-65 (U.S. 2007) (emphasis added, citations omitted). "Where a complaint pleads fact that

are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of 'entitlement to relief.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949,

173 L.Ed.2d 868 (2009), quoting, Twombly, 550 U.S. at 557, 127 S.Ct. at 1955.

### B.   Plaintiffs Have Failed to Plausibly Plead the Existence of a Conspiracy Involving Mayor Linder and the City of Chester.

All of plaintiffs claims against Mayor Linder and the City of Chester turn on the theory that

the Mayor was involved in a conspiracy with the remaining defendants to drive the plaintiffs out of

business so that the Stadium Defendants could purchase plaintiffs' land below market value. Since

the alleged conspiracy is the lynchpin of all claims against the Mayor and City, all of plaintiffs'

claims necessarily fail if the conspiracy has not been adequately pled as required by Iqbal and

Twombly. In this case, plaintiffs rely solely upon unsupported conclusory allegations, insufficient

to plausibly plead the existence of a conspiracy. Consequently, all claims against Mayor Linder and

the City of Chester must be dismissed.

The standards for "conspiracy" are essentially the same, whether couched in terms of a

common law civil conspiracy, or a conspiracy to violate section 1983. In all cases, a conspiracy

requires an *agreement* - a meeting of the minds.  Mere parallel conduct, even if consciously undertaken, is insufficient to establish a conspiracy.  See Spencer v. Steinman, 968 F. Supp. 1011, 1020[9] (E.D. Pa. 1997) (discussing standards for § 1983 conspiracy); In re Asbestos School Litigation, 46 F.3d 1284, 1292 (3d Cir. 1994) ("[U]nder the law of Pennsylvania... conscious parallelism is not sufficient to establish either a civil conspiracy or concerted action.").  Thus, there must be factual allegations showing a "combination, agreement or understanding" between the defendants, and that the defendants "plotted, planned, or conspired together to carry out the alleged chain of events...." Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974).

In Twombly, the issue before the Supreme Court was whether the plaintiffs had adequately alleged that the defendant telecommunications companies had formed a "contract, combination, or conspiracy in restraint of trade" in violation of the Sherman Act.  Twombly, 550 U.S. at 548, 127 S.Ct. at 1961.  As is the case in the conspiracy allegations raised by the plaintiffs in this matter, a Sherman Act conspiracy cannot be established by mere parallel conduct, but must be established by evidence of an agreement.  Id. at 553-54, 127 S.Ct. at 1964.  As such, Twombly directly addresses the pleading standard required to show a conspiracy as alleged by plaintiffs here.

The Twombly complaint alleged that the telecommunications companies conspired to inflate

---

[9]"Agreement is the *sine qua non* of a conspiracy.  As the Third Circuit has explained, to allege a civil conspiracy for purposes of § 1983, the plaintiff must aver 'a combination of two or more persons to do a criminal act, or to do an unlawful act by unlawful means or for an unlawful purpose.'  *See Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir.1974).  In other words, to state a claim for conspiracy under 1983, plaintiff must make 'factual allegations of combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events.'  *Hammond,* 800 F.Supp. at 1249 (citing *Ammlung,* 494 F.2d at 814); *See also Gallas v. The Supreme Court of Pennsylvania,* Civ. A. No. 96–6450, slip opin. at 36, 1997 WL 256972 (E.D.Pa. May 14, 1997) (Yohn, J.) (citing *Ammlung* ).  It is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism.  To state a claim for conspiracy under 1983, plaintiff must claim that, '[t]he private actor ... wrongfully influence[d] the state [actor's] decision ... *through a conspiracy,* or else the plaintiff must seek his remedy in a state tort claim, not a federal 1983 suit.' *Davis v. Union National Bank,* 46 F.3d 24, 26 (7th Cir.1994) (emphasis added)."

rates by agreeing not to compete with one and other in their respective market territories, and to sabotage upstart providers in their respective markets through the use of unfair agreements and billing practices. Id. at 550-51, 127 S.Ct. at 1962. In support of this conspiracy, the plaintiffs alleged that the defendants had a "compelling common motivation" to remain monopolies in their respective markets, and failed to pursue lucrative business opportunities presented to them when they would have required expansion into another provider's market territory. Id. The plaintiffs further relied on the statement of one defendant's CEO that competing in the territory of other providers was "a good way to turn a quick dollar" but was not "right." Id. Plaintiffs concluded that "[i]n the absence of meaningful competition" between the defendants, and "in light of the parallel course of conduct that each engaged in to prevent competition," the defendants "entered into a contract, combination or conspiracy to prevent competitive entry in their respective local... markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Id. at 551, 127 S.Ct. at 1963.

The Supreme Court found these allegations insufficient to state a claim. It explained that the evidence of parallel conduct or interdependence, was "consistent with conspiracy," but was "just as much in line with" similar, and unilaterally reached decisions, prompted by "common perceptions of the market." Id. at 554, 127 S.Ct. at 1964. It is for this reason that proof of a conspiracy "must include evidence tending to exclude the possibility of independent action...." Id. As such, to plead a conspiracy, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." Id. at 556-57, 127 S.Ct. at 1966. "Without more, parallel conduct does not suggest conspiracy, and **a conclusory allegation of agreement at some unidentified point does not supply facts adequate** to show illegality." Id. (emphasis added). The Supreme Court found that allegations of parallel

conduct "must be placed in a **context that raises a suggestion of a preceding agreement**, not merely parallel conduct **that could just as well be independent action**." Id. (emphasis added). Thus, the allegations must be placed in "some setting suggesting the agreement necessary" to establish the claim. Id. at 557, 127 S.Ct. at 1966. "[W]ithout further circumstances pointing toward a meeting of the minds," an allegation of parallel conduct "gets the complaint close to stating a claim, but **without some further factual enhancement** it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id. (citations omitted, emphasis added).

Turning to the allegations of the plaintiffs' complaint, the Supreme Court found that the plaintiffs had pled nothing more than parallel conduct, and that their allegations "speak[ing] directly of agreement... are merely legal conclusions resting on the prior allegations." Id. at 564, 127 S.Ct. at 1970. While the plaintiffs alleged parallel conduct, an absence of competition, and a joint interest in avoiding competition, "nothing contained in the complaint invests the action or inaction with a plausible suggestion of conspiracy." Id. at 566, 127 S.Ct. at 1971. Importantly, the Supreme Court emphasized the plaintiffs' failure to plead any facts discounting the much more likely explanations for the alleged conduct, having nothing to do with a conspiracy. It observed that "nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each [provider] intent on keeping its regional dominance." Id. at 567, 127 S.Ct. at 1972. Although the defendants' conduct "could very well signify illegal agreement," the allegations were insufficient because there was "an obvious alternative explanation," in that the providers all chose to "sit tight" in their monopolized market territories, expecting the monopoly providers in neighboring territories to do the same. Id. at 567-68, 127 S.Ct. at 1972. In short, because the plaintiffs had failed to plead any facts discounting the more likely natural explanation for the

16

conduct, and instead evidencing an agreement, their complaint "failed to state a claim for relief that was plausible on its face," and instead stated a claim that was only "conceivable."

In Iqbal, the Supreme Court applied the Twombly standard to assess the sufficiency of a claim that certain high-ranking federal officials adopted a policy with the intention to discriminate on the basis of race, religion and national origin. As such, Iqbal provides guidance on the factual standard necessary to establish that any alleged agreement was actually part of an illegal and unconstitutional scheme to deprive plaintiffs of their property, as alleged in the complaint.

In Iqbal, the plaintiff was a Muslim, Pakistani national detained in the United States on suspicion of terrorism following the September 11, 2001 terrorist attacks. Iqbal, 556 U.S. at 667-68, 129 S.Ct. at 1943. After confinement in prison during which time he claims to have been subjected to various abuses, he was deported to Pakistan. The plaintiff then filed a Bivens action (civil rights claim against federal employees) against, *inter alia*, former Attorney General, John Ashcroft, and former Director of the F.B.I., Robert Mueller. His complaint alleged that Mueller and Ashcroft created and promulgated a federal policy which subjected plaintiff to harsh conditions of confinement "solely on account of his religion, race and/or national origin and for no legitimate penological interest." Id. at 669, 129 S.Ct. at 1944. To plead a claim, the plaintiff was required to show that Mueller and Ashcroft, through their own individual actions, violated plaintiff's civil rights. Id. at 676, 129 S.Ct. at 1948.

In assessing the sufficiency of the pleadings under Twombly, the Supreme Court rejected various allegations which it deemed mere conclusions, insufficient to meet the pleading standards. Thus, the Court found that plaintiff's allegation that the defendants, "'knew of, condoned, and willfully and maliciously agreed to subject him' to harsh conditions of confinement, 'as a matter of

17

policy, solely on account of his religion, race, and/or national origin and for no legitimate penological interest," was merely a conclusory allegation not entitled to be assumed true. Id. at 680-81, 129 S.Ct. at 1951. The same was true with respect to his allegation that Ashcroft was the "principal architect" of the policy, and that Mueller was "instrumental" in adopting it. Id.

Having set aside the conclusory allegations, the Court then turned to the remaining factual averments of the complaint. The complaint alleged that in the weeks following September 11, and under the direction of Mueller, the FBI "arrested and detained thousands of Arab Muslim men." Id. at 681, 129 S.Ct. at 1951. It further alleged that a policy of holding terrorist detainees "in highly restrictive conditions of confinement until they were 'cleared' by the FBI," was approved by both Ashcroft and Mueller "in discussions in the weeks after September 11, 2011." Id.

The Supreme Court recognized that these allegations "are consistent with" the defendants "purposefully designating detainees 'of high interest' because of their race, religion of natural origin.'" Id. It found, however, as was the case in Twombly, that "**given more likely explanations, [the allegations] do not plausibly establish this [discriminatory] purpose.**" Id. (emphasis added). The Court explained that, since the September 11th attacks were perpetrated by a group of Arab Muslim men, "[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." Id. at 682, 129 S.Ct. at 1951. In light of the "'obvious alternative explanation' for the arrests," the Supreme Court ruled that the plaintiff's averments, without more, did not raise his right to relief to the plausible level. Id. at 682, 129 S.Ct at 1951-52. Consequently the claim was dismissed.

In sum, Twombly and Iqbal teach that a plaintiff alleging conspiracy to commit an illegal act must do more than assert general conduct which might be consistent with such a purpose. Instead, the plaintiffs must plead actual facts which would tend to discount other natural, obvious and innocent explanations of the conduct at issue, thereby elevating plaintiffs' theory from "conceivable" to "plausible." Plaintiffs' complaint fails this test, and Twombly and Iqbal demand its dismissal.

Plaintiffs allege that Mayor Linder entered into a conspiracy with the remaining defendants to drive the plaintiffs out of business so that the Stadium Defendants could purchase the plaintiffs' land at below market rates. Plaintiffs allege that the various defendants acted in concert to deprive plaintiffs of the opportunity to obtain needed variances to operate parking lots on their premises, and to close the parking lots without prior hearing or process in order to scare plaintiffs' patrons away, and push them out of business. Plaintiffs, however, aver no facts raising this imagined scheme to the level of plausibility.

The sum total of the allegations is that Mayor Linder issued plaintiffs a temporary parking permit in 2012, that he later ordered William Payne to issue Notices of Violation closing the parking lots in March and June 2012 due to safety concerns and the invalidity of the temporary parking permit, and that he was physically present when the police conducted some parking enforcement activities. Exhibit A at 23, 26, 29 37. Other than bald conclusory allegations of an unspecified "agreement" at an unspecified time to drive plaintiffs out of business, plaintiffs' only evidence that Mayor Linder entered into an agreement with the Stadium Defendants is the two letters from David Debusschere to the Mayor, Commissioner, and City Council in March 2013, thanking the City for its parking enforcement efforts, and requesting further efforts in that regard. Exhibit A at ¶¶ 47-48. Nowhere do the letters suggest that there was an agreement to drive plaintiffs out of business in order

19

to take plaintiffs property.  The letters are merely requests by a private property owner that the City

enforce its zoning ordinances.

The mere fact that Mayor Linder allegedly directed a City officer to issue Cease and Desist

orders, or allegedly ordered police closures of lots in response to a concerns expressed by another

property owner, does nothing to suggest an agreement and conspiracy.  It should come as no surprise

that a neighboring property owner would petition the government to enforce its regulations, or that

the Mayor of the City would direct an employee to issue notices of violation of the ordinances.  As

was the case in Twombly, plaintiffs allege only parallel conduct, in that the Stadium Defendants

allegedly wanted the zoning ordinances enforced, and the City took steps to enforce those

ordinances.  Even if both the Stadium Defendants and the City were incorrect in their interpretation

of the ordinances, these facts do nothing to establish a conspiracy to drive the plaintiffs out of

business - let alone a conspiracy intended to allow the Stadium Defendants to purchase plaintiffs'

property at a fraction of the market rate.  While the presence of such a conspiracy might be

theoretically conceivable, plaintiffs have alleged no facts whatsoever which would even begin to

discount the much more obvious explanation that the City and Mayor simply wished to enforce the

zoning ordinances.

Plaintiffs' failure to allege any facts plausibly establishing that Mayor Linder was involved

in any conspiracy is alone sufficient to dismiss the claims against the Mayor and the City.

Nonetheless, the allegations regarding Commissioner Bail also merit discussion.  Plaintiffs allege

that Commissioner Bail and his three "top officers" were paid $400.00 per event for parking

enforcement.  Exhibit A at ¶ 27.  Plaintiffs claim that this is evidence of a bribe in furtherance of the

conspiracy.  However, plaintiffs plead no facts tending to discount the much more obvious and likely

explanation that the Commissioner and his officers were compensated for the added time required to enforce safety and public order during the heavily attended sporting events held at the stadium. Such arrangements are common place and permissible between police officers and public venues. See One Three Five, Inc. v. City of Pittsburgh, 951 F.Supp.2d 788 (W.D. Pa. 2013) (discussing arrangements in which officers provide extra-duty security for private entities while in full uniform, in exchange for payments either to the city or directly to the officers for their services). Plaintiffs have pled no facts tending to discount this obvious and likely conclusion.

Plaintiffs also allege that Commissioner Bail failed to report his alleged income from the Stadium Defendants on his financial disclosure form. Plaintiffs allege that this evidences an intent to hide the income which, in turn, is indicative of a conspiracy to deprive plaintiffs of their property. Even if one could accept that the failure to disclose the alleged income (assuming disclosure was even required) evidenced an intention to "hide" the income, this fact does not tend to establish that the payments were made in furtherance of a conspiracy to drive plaintiffs out of business. Indeed, it is a poorly hidden "bribe" that is reported to the IRS on a W2. More importantly, however, there are numerous other explanations for the alleged failure to disclose, including a misunderstanding of the disclosure requirements, the absence of a legal obligation to make the disclosures, or, cynically, a desire to avoid taxes on the income. The Commissioner's alleged failure to disclose, however, does not plausibly suggest the presence of a wide reaching conspiracy to drive plaintiffs out of business by closing their parking lots, so that the Stadium Defendants could purchase the land at below-market-value.

Regardless of the allegations against Commissioner Bail, there can be no question that plaintiffs have failed to plausibly plead Mayor Linder or the City of Chester's involvement in any

21

alleged conspiracy.  Plaintiffs' "conspiracy" is made up out of whole cloth, and simply making the

conclusory allegation that such a conspiracy existed is insufficient to state a cause of action.  Since

the conspiracy is the lynchpin of all of plaintiffs' causes of action, Iqbal and Twombly demand that

plaintiffs' claims against the City and Mayor Linder be dismissed.

C.  **Plaintiffs' RICO Claims Against Mayor Linder[10] Must be Dismissed.**

Count I of plaintiffs' complaint alleges a violation of section 1962(c) of the Racketeer

Influenced and Corrupt Organizations Act (RICO Act), asserting a civil cause of action as permitted

by section 1964(c).  Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect, interstate
> or foreign commerce, to conduct or participate, directly or indirectly,
> in the conduct of such enterprises' affairs through a pattern of
> racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  "In order to plead a violation of §1962(c), [plaintiff] must allege: (1) conduct;

(2) of an enterprise; (3) through a pattern; (4) of racketeering activity."  Kolar v. Preferred Real

Estate Investments, Inc., 361 Fed. Appx. 354, 362 (3d Cir. 2010), citing Sedima, S.P.R.L. v. Imrex

Co., Inc., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 (1985), Lum v. Bank of America, 361 F.3d 217,

223, (3d Cir. 2004).  To properly allege a RICO violation pursuant to §1962(c), plaintiffs must aver

that the defendants committed at least two predicate acts of "racketeering activity" as defined by the

Act.  18 U.S.C. §1961(5).  Section 1961(1) provides an exclusive list of predicate acts which

constitute racketeering activity.  18 U.S.C. §1961(1).  The United States Supreme Court, however,

has interpreted the "pattern" element as requiring more than the mere commission of two predicate

acts.  In order to establish a pattern, plaintiffs must also show that racketeering acts are related and

---

[10]The RICO count is not directed against the City of Chester.

22

that they amount to or pose the threat of continued criminal activity. H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, (1989).

In addition to these requirements, plaintiffs must aver facts which, if proven, show that the alleged predicate racketeering acts were carried out through an "enterprise." U.S. v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527 (1981). A RICO violation requires a "finding that the defendant 'person' conducted or participated in the affairs of an 'enterprise' through a pattern of racketeering activity." Brittingham v. Mobil Corp., 943 F.2d 297, 300, (3d Cir. 1991), overr'd on other grounds, Jacquar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995). The RICO defendant charged with a violation of section 1962(c) must be "distinct" from the enterprise through which the racketeering activity is conducted. Id. Thus, under section 1962(c) the RICO defendant and the enterprise cannot be one and the same.

Finally, in order to sustain a cause of action for RICO for mail or wire fraud, plaintiffs must state with particularity the circumstances constituting the alleged fraud. Fed. R. Civ. Pro. 9(b). In other words, plaintiffs must "inject [ ] precision and some measure of substantiation into their allegations of fraud." Rolo v. City Investigating Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998), abrogation recognized on other grounds, Forbes v. Eagleson, 228 F.3d 471 (3d Cir. 2000).

When boiled down to its essence, plaintiffs' complaint attempts to elevate a land use zoning dispute to the level of criminal conduct and civil RICO violations. The facts alleged in plaintiffs' complaint reveal, upon careful scrutiny, the history of litigation surrounding several collected parcels of property involving a municipality, the parcels' owners and the ownership and management of an adjacent property, home to a professional sports franchise. Although the complaint clearly demonstrates keen differences of opinion, disputes over the appropriateness of the use of plaintiffs'

property as off-street parking, issues affecting public safety and municipal welfare, and perhaps even who will profit from parking revenue adjacent to a sports venue, nowhere does the complaint spell out a scheme to defraud, fraudulent misrepresentations or attempts by any involved parties to deceive others.

The alleged scheme to defraud plaintiffs is summed up in paragraph 38 of the complaint. There plaintiffs explain that the purpose of the "unlawful enterprise" was:

> to wrongfully prevent Plaintiffs from competing for customers with Defendants and to eventually force Plaintiffs' business out of Chester so that Defendant Scanlon, Defendant Debusschere, and their Defendant business corporations could obtain Plaintiffs' business property for less than fair market value.

See Exhibit A at ¶38.

As it relates to Mayor Linder, he allegedly participated in this scheme through signing off on an agreement which granted off-street parking permits to plaintiffs, Exhibit A at ¶23, and thereafter authorizing the issuance of a cease and desist order for some, but not all, of plaintiffs' lots, citing significant public safety issues, Exhibit A at ¶26, and a subsequent violation notice citing a determination that, despite the existing temporary permits, the operation of the properties in question was in violation of the city's zoning ordinance. Exhibit A at ¶37. An immediate appeal was taken by plaintiffs from the first cease and desist, Exhibit A at ¶31, and plaintiffs immediately sought court intervention with respect to the second violation notice. Exhibit A at ¶41. Beyond those relatively straightforward facts, set forth in public documents, there are no further allegations establishing any participation on the part of Mayor Linder in an alleged scheme to defraud.

24

1.   ___Plaintiffs do not Allege Predicate Acts Sufficient to Constitute Racketeering Activity within the Meaning of the RICO Statute.___

As noted above, in order to establish a RICO violation pursuant to section 1962(c), plaintiffs must adequately allege that defendants engaged in a pattern of "racketeering activity."  18 U.S.C. §1962(c).  "Racketeering activity" is statutorily defined to include a litany of illegal activity typically referred to as RICO "predicate acts" 18 U.S.C. §1961(1); Kolar, 361 Fed. Appx. at 359.  Among the listed RICO predicate acts are any acts indictable as mail fraud, 18 U.S.C. §1341, or wire fraud, 18 U.S.C. §1343.  18 U.S.C. §1961(1)(B).  If plaintiffs fail to plead a pattern of RICO predicate acts, they cannot proceed on a §1962(c) claim.

A person commits mail fraud when, "having devised or intended to devise any scheme or artifice to defraud he or she uses the mail, for the purpose of executing such scheme or artifice...."  18 U.S.C. §1341.  Similarly, wire fraud occurs when one transfers information by means of wire, including telephone, "for the purpose of executing such scheme or artifice."  18 U.S.C. §1343.  Although a scheme to defraud need not be fraudulent on its face, it must nevertheless "involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Brokerage Concept, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir. 1998), quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415, (3d Cir. 1991).  When interpreted in the context of the mail fraud statute, the term "to defraud" is given its common meaning of "wronging one in his property rights by dishonest methods or schemes, and usually [signifies] the deprivation of something of value by trick, deceit, chicane, or overreaching." Carpenter v. United States, 484 U.S. 19, 27, 108 S.Ct. 316, 321 (1987) (internal quotations and citations omitted); see also Kehr, 926 F.2d at 1415 (adopting the common understanding of the term

"defraud" in this RICO context as signifying the "deprivation of something of value by trick, deceit, chicane or overreaching"). Whether the alleged conduct of defendants is of the type "reasonably calculated to deceive persons of ordinary prudence" is an issue the court may decide by way of a Rule 12(b)(6) motion to dismiss in appropriate cases. Kehr, 926 F.2d at 1416.

> a.    **Plaintiffs' Complaint Fails to Set Forth Facts Sufficient to Establish an Attempt to Defraud.**

Simply stated, the facts set forth in plaintiffs' complaint fail to establish the existence of a scheme to defraud as required to establish RICO predicates based on mail or wire fraud. Although the facts alleged in the complaint clearly outline the history, and attendant litigation, of a dispute over how plaintiffs may use their properties given the City of Chester's zoning ordinance, they in no way spell out criminal activity. The dispute is laid out in the clearest of terms and plaintiffs' obvious understanding of the dispute is demonstrated by their application for a variance to allow for a non-conforming use of their property as off-street parking, Exhibit A at ¶20, their immediate appeal from the cease and desist order of April 26, 2012, Exhibit A at ¶31, and their immediate effort to seek redress through the court in response to the City's violation notice of June 7, 2012. Exhibit A at ¶41.

Nowhere does plaintiffs' complaint set forth facts demonstrating that they were tricked or deceived by any actions of Mayor Linder, any agent of the City, or for that, matter any one at all. In fact, the complaint paints a picture of plaintiffs as individuals keenly aware of their rights and particularly capable of pursuing them in the appropriate venues. Far from being victims of "trick, deceit, chicanery or overreaching," plaintiffs were ever vigilant, aware of their rights from the start, and prepared to fight vigorously for them. Though differences of opinion over those rights may have

existed (and may still exist), plaintiffs at no time allowed themselves to be deceived into foregoing redress of what they believed to be their rights in their properties. See Pedrina v. Chun, 906 F. Supp. 1377, 1423 (D. Haw. 1995) aff'd, 97 F.3d 1296 (9th Cir. 1996)(finding plaintiffs could not have been defrauded of property rights by alleged RICO defendants as plaintiffs had actual or constructive notice of defendants' plan to remove them from land).

> **b.    Plaintiffs' Complaint Fails to Set Forth Facts Demonstrating Reasonable Reliance on the Alleged Scheme to Defraud.**

Even if the facts alleged demonstrate some effort on the part of defendants to trick or deceive plaintiffs, it is clear based on the extensive litigation history spelled out in plaintiffs' complaint that they were not deceived by any actions of Mayor Linder or the other defendants at any time. Without facts demonstrating reasonable reliance on the alleged fraud, plaintiffs cannot make out a RICO violation alleging mail or wire fraud as predicates.

Although there is no definite Third Circuit case on point, the majority of courts "now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case." Baker v. Family Credit Counseling Corp., 440 F.Supp. 392, 410 (E.D. Pa. 2006) citing Nolan v. Galaxy Scientific Corp., 269 F.Supp. 635, 541 (E.D. Pa. 2003). District courts of the Third Circuit have found in numerous instances that in order to predicate a RICO claim on mail or wire fraud, plaintiffs must demonstrate reasonable reliance on fraudulent misrepresentations made by defendants. Kimmel v. Phelan Hallihan & Schmieg, P.C., 847 F.Supp. 2d 753, 771 (E.D. Pa. 2012); Walter v. Palisades Collection, LLC, 480 F.Supp. 2d 797, 806 (E.D. Pa. 2007). Thus, "[t]o state a claim under RICO predicated on alleged mail fraud, a plaintiff must make a showing of a proximate cause, which in turn requires a plaintiff to aver reliance upon a material misrepresentation by a defendant." Cent.

Transp., LLC v. Atlas Towing, Inc., 884 F.Supp. 2d 207, 215 (E.D. Pa. 2012).

In Kimmel v. Phelan Hallihan & Schmieg, P.C., plaintiffs received a foreclosure notice by mail from defendants. They immediately suspected fraud and proceeded to retain an attorney. 847 F.Supp. 2d at 771. Although plaintiffs argued that they relied on misrepresentations from defendants and felt compelled to hire an attorney in response, the court found that plaintiffs could not demonstrate reliance on alleged misrepresentations. It was clear that from the first communications, plaintiffs believed defendants' misrepresentations to be false. Thus, their RICO claim failed.

The facts in Walter v. Palisades Collection, LLC are even more basic and compelling. "A debt collector told an individual that she owed a debt; the individual disagreed; the debt collector sued; the individual contested the suit; and the debt collector withdrew the suit. The case is resolved and the individual is vindicated." 480 F.Supp. 2d at 799. Nevertheless, the plaintiff in Walter brought a RICO claim against the defendants. Judge Eduardo Robreno of the Eastern District of Pennsylvania, after a thorough review of Third Circuit opinions as well as opinions of other circuits, concluded that "the Third Circuit's position" is that "there can be no 'scheme to defraud' based on a misrepresentation if the plaintiff is aware that the misrepresentation is false." Id. at 808 - 809. Judge Robreno concluded that plaintiffs in Walter did not rely on defendants' misrepresentations and in fact acted in "defiance." "After being (falsely) told they were liable on the debt, they hired lawyers and fought (and won) the lawsuits." Id. at 806.

In the instant case, the plaintiff parking lot owners immediately took legal action at every turn to protect their rights against any real or perceived attempt to fraudulently deprive them of their property rights. If any attempt has been made on the part of Mayor Linder or others to deceive them and divest them of their property rights through mail or wire fraud, plaintiffs clearly have not relied

28

on such misrepresentations.  In fact, as did the plaintiffs in the <u>Walter</u> case, they have defied any attempts to deprive them of their property or property rights.  To the extent attempts were made to falsely deprive them, through their swift and aggressive recourse to litigation and the courts, plaintiffs have demonstrated their lack of reasonable reliance, knowledge of their rights, and ability to vindicate themselves.  Thus, they have not been proximately harmed by a RICO violation as they have not relied on any alleged scheme to defraud.

> **c.** **Plaintiffs Set Forth No Facts Implicating Mayor Linder in an Alleged Scheme to Bribe Members of the Chester Police Department.**

Among the alleged RICO predicate acts set forth in plaintiffs' complaint are instances of bribery under title 18 of the United States Code, section 201.  In order to demonstrate bribery, it is necessary to show "proof of a quid pro quo where a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  <u>See</u> <u>United States v. Holck</u>, 398 F. Supp. 2d 338, 348 (E.D. Pa. 2005), <u>citing</u> <u>Evans v. United States</u>, 504 U.S. 255, 268, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).  For a defendant to be a part of a pattern of racketeering activity, it much be shown that a defendant had actual knowledge of the racketeering activity, such as bribery, of the RICO conspiracy.  <u>United States v. Phillips</u>, 874 F.2d 123, 128 (3d Cir. 1989).

Plaintiffs contend that Commissioner Bail and various ranking members of his department accepted payment as employees of defendant Global Spectrum, Inc. for their work during events at the stadium site.  Exhibit A at ¶¶ 15, 27, 46, 59, 62, 63, 64.  Nowhere, however, do plaintiffs allege that Mayor Linder was offered any payment, accepted any payment, authorized any payment or acted in any way based upon any payment made to others.  In fact, plaintiffs' complaint does not allege

29

specifically that Mayor Linder was even aware of payments made by defendant Global Spectrum, or any other defendants, to Commissioner Bail.

As Mayor Linder is not alleged to have received any payments, made any payments, acted in his official or his individual capacity based on any payments, or have any knowledge of any payments, he cannot conceivably have any RICO liability for alleged predicate acts based on bribery.

### 2. *Plaintiffs do not Allege a Pattern of Racketeering Activity Sufficient to Establish a RICO Cause of Action.*

In addition to failing to allege one or more predicate acts of racketeering activity, plaintiffs have failed to allege a pattern of any such activity sufficient to support a RICO cause of action. Specifically, plaintiffs have failed to allege a pattern of conduct that involves continued criminal activity over a long period of time, or short term conduct that threatens to continue into the future.

In order to sustain a RICO claim, plaintiffs must establish that a RICO defendant participated in a pattern of racketeering activity in association with the RICO enterprise. Brittingham v. Mobil Corp., 943 F.2d 297, 300 (3d Cir. 1991). The RICO statute defines a "pattern of racketeering activity" as the commission of at least two acts of racketeering within a ten year period. 18 U.S.C. §1961(5). As noted previously, however, The United States Supreme Court has interpreted the pattern requirement to include more than the mere commission of two predicate acts within the specified time frame. H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238, 109 S.Ct. 2893, 2900 (1989). The plaintiff must show that the racketeering acts are related and that they amount to or pose a threat of continued criminal activity. Id. at 239; see also, Tabas v. Tabas, 47 F.3d 1280, 1292, (3d Cir. 1995).

Predicate acts are deemed related if "they have the same or similar purpose, results,

participants, victims or methods of commission...." H.J., Inc., at 240. Continued criminal activity, or "continuity," can refer to a "closed period of repeated conducted" or "to past conduct that by its nature, projects into the future with a threat of repetition." Id. at 241. Regardless of whether the racketeering activity was established over a closed period of time in the past, or threatens continued criminal activity into the future, the Supreme Court has observed that in crafting the RICO statute, "Congress was concerned... with long term criminal conduct." Id. at 242.

Where the underlying predicate acts establishing racketeering activity are mail fraud, a statute pursuant to which innocent mailings may otherwise be indictable offenses, the Third Circuit has further observed that the number of instances of actual deceitful conduct is more relevant to the continuity analysis than the number of mailings. Kehr Packages, 926 F.2d at 1414. For this reason, "the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis." Id.

As noted above, the essence of the RICO allegation in this case is defendants' collective attempt to wrongfully prevent plaintiffs from competing for customers in order to force plaintiffs out of business. This was allegedly achieved through the use of the U.S. mail to deliver the cease and desist order of April 26, 2012, Exhibit A at ¶27, and to deliver two letters from defendant Debusschere dated March 12, 2013, and March 20, 2013. Exhibit A at ¶¶47 and 48. Thus, three alleged uses of the United States mail are identified as predicates establishing the pattern of racketeering activity.

      a.        **Plaintiffs Fail to Establish Continuity over a Closed Period.**

Even if it were accepted as true that the facts set forth in plaintiffs' complaint allege criminal

conduct as opposed to a rather complicated zoning dispute, nothing in plaintiffs' complaint suggests ongoing criminal conduct over an extended period of time in the past. The most plaintiffs' complaint alleges is three uses of the U.S. mail: one to communicate a cease and desist order based upon a violation of temporary parking permits, and two others to communicate issues of concern on the part of one group of defendants to the City and its agents regarding parking at and near the stadium. Moreover, as this conduct is directed toward only one discrete group of individuals relating to only one issue – the use of their property as off-street parking – there is nothing to suggest other victims or other instances of criminal conduct on the part of defendants. See Banks v. Wolk, 918 F.2d 418, 423 (3d Cir. 1990) (While the fact that an alleged RICO conspiracy has a only single victim is not necessarily dispositive, such allegations, without evidence that the conspirators threaten some future harm to someone, amount to nothing more than an allegation of "garden variety" fraud.). Thus, no RICO pattern is properly alleged.

### b.   Plaintiffs Fail to Establish Continuity Over an Open-Ended Period of Time.

The allegations of the complaint are likewise insufficient to establish the threat of future criminal conduct that projects into the future. "Continuity in an open-ended period, i.e., a period involving a series of predicate acts that project into the future, may be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activities or the predicate acts are part of an entity's regular way of doing business." U.S. v. Pelullo, 964 F.2d 193, 208 (3d. Cir. 1992).

Nothing in the complaint suggests that the predicate acts themselves, or for that matter the alleged scheme to defraud, involve the threat of future, long-term racketeering activity. To the

contrary, the conduct alleged includes three uses of the U.S. mail, all directed to the singular issue of parking near and around the stadium, and involves a one-time dispute over the appropriate use under the zoning code of plaintiffs' parcels. See Banks v. Wolk, 918 F.2d at 425 (affirming RICO complaint dismissal where alleged conspiracy was to obtain favorable price for single piece of property without any evidence of continued criminal activity). Again, nothing exists to suggest, to the extent this zoning dispute could be deemed a criminal conspiracy, that there are or may be other victims or future attempts to carry out a similar "scheme to defraud."

Given the limited scope of the conduct alleged - i.e., a single, unresolved land use dispute involving a single group of partners – nothing exists to suggest the threat of continued long-term racketeering activity. Therefore, no RICO pattern is alleged.

### 3.   *Plaintiffs do not Allege the Existence of a RICO Enterprise.*

Even if plaintiffs sufficiently plead a pattern of racketeering activity, they must also establish that the alleged pattern of predicate acts was carried out through an "enterprise." U.S. v. Turkette, 452 U.S. 576, 101 S.Ct. 2524 (1981). Here, plaintiffs have failed to plead an enterprise as the group of individuals they claim are associated for the purpose of committing RICO fraud do not constitute an ongoing organization, do not function as a continuing unit, and are not, as required under the statute, separate and apart from the pattern of activity alleged.

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). As explained by the Supreme Court, an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 583, 101 S.Ct. at 2528. To make out a RICO enterprise, one must show "an ongoing

33

organization, formal or informal" through which "the various associates function as a continuing unit." Id.

In short, in order to sustain a claim for civil RICO, plaintiff must prove three elements necessary to demonstrate the presence of a RICO enterprise: "(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages." U.S. v. Pelullo, 964 F.2d 193, 211, (3d Cir. 1992) (citation omitted). "The same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization." Id., 964 F.2d at 212, quoting U.S. v. Perholtz, 842 F.2d 343, 363 (D.C. Cir. 1988).

As noted previously, the alleged "predicate acts" attributed to defendants amount to the exchange of correspondence arising out of a dispute over a collection of parcels of land owned by one group of individuals and intended for use by those individuals for one purpose: off-street parking at stadium events. The scheme to defraud is limited to the attempt to deprive this single group of property speculators of income, and, thus, drive them out of business. There are no allegations in plaintiffs' complaint tending to establish that, apart from a single objective directed toward a single group of individuals, the defendants are in any way organized for an ongoing purpose or function in any way as a continuing unit.

The so-called "enterprise" is allegedly formed for a single purpose and nothing more. There are no other victims of defendants in the past, and there are no future victims contemplated by the collective defendants. There is nothing to suggest any organizational framework, hierarchy, or decision making apparatus. Given the absence of any formal organization, suggestion of any

34

ongoing unity, or threat of victimization beyond one discrete collection of partners, the "enterprise" that plaintiffs attempt to outline in their complaint is not in any way separate, apart or distinguishable from the so-called racketeering activity. In sum, where no distinct RICO enterprise exists, no RICO violation can stand.

### 4. *Plaintiffs Fail to Sufficiently Plead Facts Under Rule 9(b).*

Notwithstanding the foregoing, plaintiffs have failed to plead facts with sufficient specificity as to allegations against Mayor Linder. "Where a plaintiff relies on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity." Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) *abrogated in part on other grounds by* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Plaintiffs may satisfy this requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud... Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Lum, 361 F.3d 217, 224(internal quotes omitted).

Plaintiffs have failed to plead with particularity any facts which would lead to a conclusion that Mayor Linder was involved with either mail or wire fraud. The facts pled as to Mayor Linder, repeatedly state that he committed mail and wire fraud in furtherance of an illegal scheme, yet no where specify what act of mail or wire fraud he committed. See Exhibit A at ¶76, ¶79, ¶83, and ¶85. Where any particularity is plead, it is as to money transfers to Commissioner Joseph Bail and others with no allegation as to Mayor Linder in any way being connected with the sending or receipt of those payments, or even having knowledge of the transfers. See Exhibit A ¶79 and ¶85. The closest

plaintiffs come to making a particular allegation as to wire or mail fraud regarding Mayor Linder is paragraph 83 where it is alleged that "directions" were sent as to the alleged scheme by defendants generally. See Exhibit A ¶83. However, the only correspondence are letters, addressed to Mayor Linder amongst others, which discuss the state of parking around the stadium and illegally operated parking lots, which, even if read in the light most favorable to plaintiffs' allegations, in no way indicate any sort of fraudulent scheme being carried out by Mayor Linder and other named defendants. See Exhibit A ¶47 and ¶48.

Even were plaintiffs' pleadings to be taken at face value, these letters do not rise to the level of fraud and are general discussions of the traffic and parking situation around the stadium during events and attempts to coordinate efforts to enforce zoning and parking regulations which are entirely lawful. Nothing in the pleadings contain any particulars as to Mayor Linder being involved in either wire or mail fraud. As required by Lum, the facts plead contain neither the date, place or time of the fraud, nor do they allege who made a misrepresentation to whom, nor do they allege the content of the misrepresentation. Accordingly, there are no facts plead which, even if true, would lead to a conclusion of a RICO violation by Mayor Linder or which were plead with the particularity necessary to put Mayor Linder on notice of specific acts of precise misconduct as required by Rule 9(b).

In summary, since plaintiffs have failed to allege a pattern of predicate acts carried out by a RICO enterprise, and have failed to meet the requirements of Rule 9(b) for pleading fraud, all of plaintiffs' RICO claims against Mayor Linder must be dismissed with prejudice.

36

**D.**     **Plaintiffs' Section 1983 Civil Rights Claims Against Mayor Linder and the City of Chester Must be Dismissed.**

Plaintiffs' section 1983 civil rights claims against Mayor Linder and the City of Chester must be dismissed because plaintiffs have failed to allege violations of their Fifth and Fourteenth Amendment rights. Plaintiffs' section 1983 civil rights claims against the City of Chester must also be dismissed because plaintiffs have failed to plead the existence of a City custom or policy, adopted or ratified by a City policy maker, that directly caused their alleged constitutional violations.

Section 1983 provides a cause of action to private citizens for deprivations of their constitutional rights by a person acting under the color of state law. 42 U.S.C.A. § 1983. "By itself, Section 1983 does not create any rights, but provides a remedy for violations of those rights created by the Constitution or federal law." Morse v. Lower Merion School Dist., 132 F.3d 902, 906-07 (3d Cir. 1997), citing, Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689 (1979). "In order to state a claim, plaintiff must show that the defendants, acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States." Id., citing, Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908 (1981). Thus, "proper analysis requires [the court] to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120, 112 S.Ct. 1061, 1066 (1992) (citations omitted).

"[T]he first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated, and to determine whether the plaintiff has alleged the deprivation of a constitutional right at all." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.

2006), quoting, Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000). Absent a constitutional violation, the plaintiff cannot make out a section 1983 claim.

Furthermore, even if a Constitutional violation exists, a plaintiff must do more to make out a section 1983 claim against a municipality. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell v. Dept. of Soc. Srvcs. of City of N.Y., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978). A municipality may only be held liable when the unconstitutional conduct by the state-actor "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." Id. at 690, 98 S.Ct. at 2035-36. Thus, even where a constitutional violation exists, there is still "the question of whether **there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.**" Collins v. City of Harker Heights, 503 U.S. 115, 123, 112 S.Ct. 1061, 1067, 117 L.E.2d. 261 (1992) (citations omitted, emphasis added).

In this case, plaintiffs section 1983 claims fail on both counts. Plaintiffs have failed to plead the violation of a Constitutional right by Mayor Linder or the City of Chester. They have further failed to plead that any alleged constitutional violation was caused by a City custom or policy.

> 1. ***Plaintiffs Have Failed to Allege a Violation of Their Fourteenth Amendment Due Process Rights.***

"The Fourteenth Amendment prohibits a state from 'depriving any person of life, liberty, or property, without due process of law....'" Elsmere Park Club, L.P. v. Town of Elsemere, 542 F.3d

412, 417 (3d Cir. 2008), quoting, U.S. Const. Amend. XIV, § 1 (brackets omitted).  The Due Process clause encompasses both procedural and substantive components.  Plaintiffs' complaint alleges that their due process rights were violated by "prohibiting plaintiffs from lawfully using their property without any due process hearing."  Exhibit A at ¶ 91.  This suggests plaintiffs' claims are premised on procedural due process.  Out of an abundance of caution, however, both forms of due process will be addressed.

Prior to proceeding with the Constitutional analysis, it is first necessary to identify the conduct at issue.  Plaintiffs' complaint alleges that the defendants violated their Fourteenth Amendment due process rights by: (1) making illicit payments to Commissioner Bail; (2) falsely imprisoning plaintiffs' customers; (3) filing false statements of Financial Interest forms; and (4) causing the issuance of "illegal and improper Notices of Violations prohibiting plaintiffs from lawfully using their property without any due process hearing."  Exhibit A at ¶ 91.

The first three of these items are easily dispatched.  Assuming, *arguendo*, that the defendants made illicit payments to Commissioner Bail, falsely imprisoned plaintiffs' customers, and filed false Statement of Interest forms, *none of these acts violated **plaintiffs' Due Process rights**.*  It seems clear that issuance of illicit payments to Commissioner Bail and his alleged filing of false Financial Interest Forms did not violate plaintiffs' rights.  While this conduct is alleged to have been carried out in furtherance of the alleged plot to deprive plaintiffs of the use of their property, the alleged conduct, in and of itself, is not a violation of plaintiffs' rights.  Likewise, to the extent plaintiffs' customers' rights were violated when they were allegedly falsely imprisoned by barriers and crime scene tape, *plaintiffs have no standing to assert the rights of their customers.*  Nasir v. Morgan, 350 F.3d 366, 376 (3d Cir. 2003) (reciting strict elements necessary to invoke third party standing, not

39

applicable here[11]).  Consequently, plaintiffs cannot premise a section 1983 action on any of this alleged conduct.

To the extent plaintiffs hope to make out a section 1983 claim, it must be premised upon the alleged issuance of the Notices of Violation "without any due process hearing." Initially, plaintiffs' claims against the City of Chester and Mayor Linder **must be limited to activities that occurred after June 12, 2012,** when the second, June 2012 Notice of Violation was withdrawn and the appeal of that action was discontinued, because plaintiffs **released any claims they may have had against the City and its agents, including the Mayor, prior to that date**.  Consequently, the original agreement to issue a temporary permit, the April 2012 Cease and Desist order, the June 2012 Notice of Violation, and the police closure of plaintiffs' lots prior to that date cannot be at issue.  See Exhibit F to Plaintiff's Complaint.  **The only closures at issue** (with respect to the City and the Mayor) **are the March 2, March 16, April 13, and May 4, 2013 blockades and tape erected by the police, and the March 15, 2014 blockading and taping of the "property."**  All prior closures, notices of violation and cease and desist orders were discharged by the June 12, 2012 stipulated order.  See, e.g. Bickings v. Bethlehem Lukens Plate, 82 F.Supp.2d 402, 405-06 (E.D. Pa. 2000) (reviewing case law enforcing releases as contracts).  The conduct at issue having been identified, a constitutional analysis can proceed.

a.     **Plaintiffs Have Failed to State a Procedural Due Process Violation.**

When assessing a procedural due process claim under section 1983, the court must make a

---

[11]To assert third party standing, the plaintiff must suffer injury, the plaintiff and third party must have a close relationship, and the third party must face some obstacles that prevent it from pursuing its own claims.  None of these factors apply to claims that plaintiffs' customers were falsely imprisoned by Chester police officers.

two step inquiry.  First, the court must determine "whether 'the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property.'" Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  If so, the court must determine ""'whether the procedures available provided the plaintiff with 'due process of law.'" Id.; Perano v. Twp. of Tilden, 423 Fed. Appx. 234, 237 (3d Cir. 2011).  With respect to the procedures afforded, a procedural due process claim may be based on the presence or absence of both pre-deprivation and post-deprivation process.

### i.   *Plaintiffs Have Not Pled a Protected Property Interest.*

Plaintiffs' Fourteenth Amendment section 1983 claims should be dismissed for the simple reason that they have not pled any facts suggesting that they had a vested right to use any of the closed lots for public parking.  "State law defines property interests for purposes of procedural due process claims." Ruiz v. New Garden Twp., 376 F.3d 203, 206 (3d Cir. 2004).  Property interests held in violation of zoning ordinances are "tenuous at best." Id., citing, Puelo v. Zoning Hearing Bd. of Schuylkill Twp., 722 A.2d 789 (Pa. Cmwlth. 1999).  For example, in Puelo, the Pennsylvania Commonwealth Court held that a property owner did not acquire a vested right in a structure which was constructed in violation of zoning requirements, and without first obtaining the necessary building permits. Puelo, 722 A.2d at 791.

Similarly, in McKivitz v. Twp. of Stowe, 769 F. Supp.2d 803 (W.D. Pa. 2010), plaintiffs sought to use their home as a boarding residence, in violation of a pre-existing zoning ordinance.  When the plaintiffs were cited for the violation and refused a variance, they asserted a procedural due process claim. The District Court dismissed the procedural due process claim on the ground that plaintiffs were not deprived of any liberty interest by the enforcement of a pre-existing ordinance.  It explained:

> [Plaintiffs] define the relevant "deprivation" as their inability to do what a preexisting, generally applicable zoning ordinance had already precluded them from doing. **A generalized inability to do what is legally prohibited cannot be fairly characterized as a constitutionally-protected liberty or property interest.** ...An individual cannot evade a legislative prohibition by characterizing his or her inability to do what is prohibited as "deprivation" of his or her "liberty" to do what is prohibited.

Id. at 836 (emphasis added).  Since the plaintiffs could not show the deprivation of a constitutionally protected interest, they could not establish a violation of their due process rights. Id.  In other words, a plaintiff cannot claim a protected right to use their land in violation of pre-existing zoning ordinances.

In this case, plaintiffs' complaint is devoid of any facts suggesting that they possessed a vested property interest in using their properties as public parking lots in March through May 2013, when the first non-discharged closures occurred.  Plaintiffs admit that the lots initially were not zoned for parking.  Consequently, plaintiffs' could not have had a vested right to use the property for public parking at the time of purchase.  Furthermore, the only allegation in the complaint suggesting that plaintiffs obtained the right to use their land for parking stems from the issuance of the temporary parking permit in April 2012. Assuming the presence of the temporary parking permit granted plaintiffs a constitutionally protected property interest in the use of their land for public parking, that permit, by its terms, was only valid for the calendar year 2012.  Thus, the temporary parking permit had expired by the Spring of 2013 when the first relevant closures occurred.

Aside from the expired temporary permit, the complaint is completely devoid of any other allegations reciting that plaintiffs obtained the right to use their land for public parking prior to the closures in the Spring of 2013.  For example, plaintiffs do not allege the presence of a new temporary permit or an applicable zoning variance.  Consequently, the complaint fails to establish that any

closures were carried out on properties where public parking may have been permitted.

The same is true with respect to the March 2014 closure of plaintiffs' lot or lots (the complaint does not specify). Plaintiffs claim that this closure was in violation of the March 2013 injunction entered by the Delaware County Court of Common Pleas. However, as discussed above, that preliminary injunction was dissolved in January 2014. Consequently, the dissolved injunction vested plaintiffs with no constitutional protections. While plaintiffs also plead that they were granted a variance to operate parking facilities on three of their properties, plaintiffs do not identify which properties were subject to the variance, and, more importantly, have failed to allege that the March 2014 closures were carried out on any of the properties for which a variance was obtained.

In sum, plaintiffs have failed to plead any facts establishing that they possessed a vested property right in the use of their properties for public parking at the time of the alleged closures in the Springs of 2013 and 2014, or that any of the closures were carried out on properties where they had a right to conduct public parking. Consequently, plaintiffs have failed to a state a violation of their Fourteenth Amendment procedural due process rights. For this reason alone, plaintiffs' section 1983 claims based on procedural due process should be dismissed.

ii. ***Plaintiffs Have Failed to Allege a Due Process Violation Based on the Failure to Provide a Pre-Deprivation Hearing.***

Assuming plaintiffs had acquired a vested right to use some or all of their properties for public parking, plaintiffs complaint appears to suggest that they were entitled to a pre-deprivation hearing before their parking lots could be closed on the dates alleged. Such an argument is unfounded, because plaintiffs do not allege that the lots were closed pursuant to an established municipal procedure which is constitutionally infirm. There is no pre-deprivation due process

violation when the violation was caused by the negligent or intentional conduct of a municipal employee acting outside of the municipal procedures.

It is well established that pre-deprivation process is only required "where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." Hudson v. Palmer, 468 U.S. 517, 532, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984).  On the other hand, "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." Id., citing, Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).  This is true whether the employee's conduct is negligent[12] or intentional.  Id.  So long as the municipality provides meaningful post-deprivation process to correct the employee's conduct, a deprivation of property carried out by an employee who is not acting pursuant to municipal procedures does not violate procedural due process.  Id. at 534, 104 S.Ct. at 3204.  It is only when the deprivation of property is carried out through an established municipal procedure that pre-deprivation process may be required.

For example, in Hudson v. Palmer, a prison inmate filed suit against a prison guard, claiming that the guard intentionally destroyed non-contraband property in his cell as part of an ongoing scheme to harass and intimidate him. Hudson, 468 U.S. at 520, 104 S.Ct. at 3197.  Among other things, the prisoner claimed that this deprived him of his property without due process.  Since, however, the intentional conduct of the prison guard at issue was not carried out pursuant to an established prison procedure, and since the prison provided adequate procedures to remedy the

---

[12]A negligent deprivation of property is insufficient to establish a violation of the Fourteenth Amendment. Daniels v. Williams, 474 U.S. 324, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986).

44

destruction of his property, the claim was dismissed. Id. at 534-35, 104 S.Ct. at 3204-05. Similarly, in Parratt, the Supreme Court reached the same result in a procedural due process challenge raised when a prison's mail department accidentally lost a package shipped to the prisoner. Parratt, 451 U.S. at 543, 101. S.Ct. at 1917, overruled on other grounds, Daniels v. Williams, 474 U.S. 324, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). Since the officers in the mail department failed to follow the established prison procedures, and there was an adequate post-deprivation remedy in tort law, the prisoner was not entitled to a predeprivation hearing, and the procedural due process claim was dismissed. Id.

Importantly, the rule of Parratt and Hudson applies to plaintiffs' procedural due process claims against both the City of Chester and Mayor Linder. In Hudson, the inmate's claim was against the individual prison guard who destroyed his property, and the not prison authority. Hudson, 468 U.S. at 520, 104 S.Ct. at 3197. The inmate argued that the individual guard should be liable for the procedural due process violation, Parratt notwithstanding, "because an agent of the state who intends to deprive a person of his property 'can provide predeprivation process,'" and, therefore, "'must do so.'" Id.

The Supreme Court rejected this argument. It explained that the relevant inquiry for procedural due process purposes is whether *the state* was in a position to provide pre-deprivation process. Id. "Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the state is in a position to provide for predeprivation process." Id. Consequently, Hudson refused to impose section 1983 liability on the individual prison guard for the alleged procedural due process violation, despite the fact that it was the prison guard himself who caused the property deprivation without first invoking any process.

45

Id.; Ball v. Oden, 425 Fed. Appx. 88, 89 (3d Cir. 2011) (dismissing procedural due process claims against prison guards in their individual capacity under Hudson); Shakur v. Coelho, 421 Fed. Appx. 132, 135 (3d Cir. 2011) (dismissing procedural due process claim against individual prison guards for unauthorized deprivations of property); Brown v. Muhlenberg Twp., 269 F.3d 205, 213 (3d Cir. 2001) (rejecting claim that police officer could be liable for procedural due process violation in shooting plaintiff's dog, citing Hudson).

In this case, plaintiffs do not contend that the closure of their parking lots was carried out pursuant to established municipal procedures. To the contrary, plaintiffs specifically allege that the closures of their lots were carried out in violation of the Municipal Planning Code, which they allege provides adequate pre-deprivation process. Exhibit A at ¶¶ 32-35. Indeed, plaintiffs allege that "[t]he unilateral closure by the Police Department, solely as a result of a determination by the Police Department that there is a zoning violation on a business property, without any hearing of any type, is not permitted under the Pennsylvania Municipalities Planning Code...." Id. at ¶ 35. Thus, plaintiffs concede that the closure of their lots was not carried out pursuant to a municipal procedure. Rather, plaintiffs claim that the closures were carried out by an allegedly illegal combination of the corporate and individual defendants for the purpose of obtaining plaintiffs' property at below mark value. As explained by the Supreme Court in Hudson and Parrat, such unauthorized conduct does not give rise to a procedural due process claim, so long as adequate post-deprivation remedies are in place.

Here, plaintiffs make no complaints about the available post-deprivation remedies, and appear to have successfully taken full advantage of them. Moreover, the Third Circuit has held that "Pennsylvania's procedures for challenging zoning ordinances substantially conform[] with the due

46

process guidelines enunciated by the Supreme Court." Id. at 1128, quoting, Rogin v. Bensalem Twp., 616 F.2d 680, 695 (3d Cir. 1980); Perano, 423 Fed. Appx. at 237.  Thus, there can be no question that the post-deprivation remedies provided were constitutionally sufficient.

Since plaintiffs claim that their alleged property deprivations were carried out by individual municipal employees, acting in violation of municipal procedures, and since there is an adequate post-deprivation remedy for the alleged deprivations, plaintiffs cannot make out a procedural due process claim under the Fourteenth Amendment for the alleged failure to provide predeprivation process.

     iii.     ***Plaintiffs Have Failed to Plead a Violation of Their Rights to Post-Deprivation Procedural Due Process.***

Plaintiffs' complaint does not appear to allege that the "post deprivation" process provided to them was inadequate.  Indeed, based on the complaint, it appears plaintiffs availed themselves of a variety of post-deprivation processes, and succeeded in obtaining the right to operate parking lots on their premises.  Moreover, even if plaintiffs had taken umbrage at the post-deprivation procedures available to challenge the closings, "a state provides adequate due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body.'"  Bello v. Walker, 840 F.2d 1124, 1128 (3d Cir. 1988), abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA, 316 F.3d 392, 401 (3d Cir. 2003), citing, Cohen v. City of Philadelphia, 736 F.2d 81, 86 (3d Cir. 1984).  The Third Circuit has held that "Pennsylvania's procedures for challenging zoning ordinances substantially conform[] with the due process guidelines enunciated by the Supreme Court." Id. at 1128, quoting, Rogin v. Bensalem Twp., 616 F.2d 680, 695 (3d Cir. 1980); Perano, 423 Fed. Appx. at 237.  Thus, plaintiffs cannot make out a valid post-deprivation

procedural due process claim.

Since plaintiffs had no right to a pre-deprivation hearing before being stopped from using their property in violation of a zoning ordinance, and since plaintiffs cannot contest the constitutional sufficiency of the post-deprivation remedies available to them to challenge the zoning decision, plaintiffs have failed to plead a procedural due process violation under the fourteenth amendment.

> **b.    Plaintiffs Have Failed to State a Substantive Due Process Violation.**

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008). As more fully set out above, plaintiffs have failed to plead any facts suggesting that they had a constitutionally protected right to use their properties for public parking in violation of the pre-existing zoning ordinances. For this reason alone, the substantive due process claim must fail. Assuming for the sake of argument, however, that plaintiffs had a constitutionally protected interest, they have also failed to plausibly plead conduct that "shocks the conscience."

The purpose of the "shocks the conscience" standard is to prevent the federal courts from "being cast in the role of a 'zoning board of appeals.'" Id., quoting, Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982).

> [E]very appeal by a disappointed developer from an adverse ruling of the local planning board involves some claim of abuse of legal authority, but "it is not enough simply to give these state law claims constitutional labels such as 'due process' or 'equal protection' in order to raise a substantial federal question under section 1983." [Estabrook, 680 F.2d at 833]. **Land-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with "improper" motives.**

United Artists, 523 F.3d at 402 (emphasis added).   As such, "only the most egregious official conduct" shocks the conscience for substantive due process purposes. Chainey, 523 F.3d at 219, quoting, United Artists, 316 F.3d at 400 (additional citations omitted). As noted, allegations that a government official acted with "improper motives" is not sufficient to surmount this standard. United Artists, 523 F.3d at 402.   It has been suggested that only facts showing "corruption or self-dealing" may be sufficient to meet the "shocks the conscience" standard. Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (3d Cir. 2004).

"[I]nconsistent application of zoning requirements, unnecessary inspections, delaying permits and approvals, improperly increasing tax assessments, and 'maligning and muzzling' a property owner [are] not enough to shock the conscience when those actions were not coupled with interference with a constitutionally protected activity or ethnic bias." Perano v. Twp. of Tilden, 423 Fed. Appx. 234, 238 (3d Cir. 2011), citing, Eichenlaub, 385 F.3d at 286. In Perano, supra, the Third Circuit found insufficiently "conscience shocking" allegations that a Township intentionally failed to abide by a consent order requiring the township to provide utility services to a contested development; the township obstructed and harassed the property owner to prevent it from developing utilities required for zoning approval; the township conducted inspections and issued violations without notice or opportunity to be heard; the township notified the public that the owner's facility was being operated without a permit without providing any prior notice or hearing; and the township sought to force the owner to cede property to the township for an easement. Perano, 423 Fed. Appx. at 235-236.

Most instructive for purposes of this motion is Locust Valley Golf Club, Inc. v. Upper Saucon Twp., 391 Fed. Appx. 195 (3d Cir. 2010). In that case, members of a township zoning board

49

were accused of purposefully thwarting a developers' plan to develop a golf course into a housing development by refusing it permits and a variance. In particular, plaintiffs presented evidence that the board members attempted to improperly influence an independent engineer retained to study the impact of a proposed sewage plan, and pressured him to write a report favorable to the board's position. Id. at 198. The plaintiffs alleged that this conduct was undertaken because one of the zoning board members had previously attempted to purchase the golf course land. This showed that the board acted out of the hope that the board member might be able to buy the golf course land for himself, and later develop it. Id. at 199. The Third Circuit found that, taking these allegations as true, they did not show improper motives that were so egregious as to "shock the conscience" for constitutional purposes, and reached this conclusion as a matter of law. Id. at 199-200.

Applying these authorities, it is clear that plaintiffs have not alleged conscience shocking behavior by Mayor Linder or the City of Chester. The gist of plaintiffs' complaint is that the Mayor authorized or permitted the Chester Police Department to close plaintiffs' lots on various occasions, allegedly in contravention of local law and judicial orders. They claim that this conduct was undertaken for the alleged purpose of forcing plaintiffs to sell their properties to defendants Scanlon and Debusschere and their associated business entities. Exhibit A at ¶ 38. As found by the Third Circuit in Locust Valley, *supra*, an allegation that municipal officials acted to provide themselves, or, as is the case here, others, with an opportunity to purchase the land in question is not sufficient to establish corruption or self-dealing that shocks the conscience for substantive due process purposes. Otherwise, this complaint presents normal disputes that arise in land use contests, and which do not reach constitutional levels. For this reason alone, plaintiffs' substantive due process claim should be dismissed.

50

Furthermore, an individual defendant in a section 1983 "civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*.  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (citations omitted).  Even if plaintiffs' allegations of "corruption and self dealing" could establish conscience shocking behavior by some of the defendants, plaintiffs' substantive due process claim against Mayor Linder still fails as a matter of law because plaintiffs have failed to plead any non-conclusory facts raising Mayor Linder's claimed involvement in any imagined conspiracy above the speculative level, as required by Twombly and Iqbal.

Although plaintiffs attempt to cast their complaint as one alleging a widespread conspiracy to cheat plaintiffs out of their properties, the allegations against Mayor Linder are virtually non-existent.  Plaintiffs allege Mayor Linder executed the March 2012 agreement *granting* plaintiffs temporary parking permits for their lots, but then instructed William Payne to issue notices of violations in April 2012 and June 2012[13].  Exhibit A at ¶¶ 23, 26, 37.  Plaintiffs also allege that the Mayor was physically present during some of the enforcement operations.  Exhibit A at ¶ 29. Plaintiffs do not allege that Mayor Linder ordered or directed the closures in March of 2013 and 2014.  Exhibit A at ¶¶ 46, 56.  Even if this conduct could be considered "improper," the allegations certainly are not sufficient to implicate the Mayor in a conspiracy to deprive plaintiffs of their property in order to transfer the land to the Stadium Defendants.

While plaintiffs allege that Mayor Linder "caused" the 2012 notices of violation be issued at the direction of defendants Scanlon and Debusschere, these allegations are unsupported

---

[13]As noted above, all claims based on this conduct have been released.

conclusions.  Plaintiffs do not allege when, where, how or why any such order was issued by

Debusschere and/or Scanlon, and allege no motive for the Mayor to bow to the whims of these two

individuals.  Plaintiffs do not allege that Mayor Linder received any pay from Debusschere, Scanlon

or their companies[14], nor do plaintiffs allege that Mayor Linder otherwise benefitted from the alleged

arrangement.   The most plaintiffs offer are two letters from Debusschere to Mayor Linder,

Commissioner Bail and City Council in March 2013, in which Mr. Debusschere praises some aspects

of the City's parking enforcement, and complains about other areas.  Exhibit A at ¶¶ 47, 48.

Nowhere do the letters intimate or suggest a conspiracy, agreement or other plan to join forces in

furtherance of a plan to take plaintiffs' property.  At most, they suggest efforts by the stadium, as a

property owner, to encourage and assist in the enforcement of local ordinances.  Plaintiffs' claim that

Mayor Linder acted at the behest of Scanlon and Debusschere to deprive plaintiffs of their property

is made up out of whole cloth, with no supporting factual averments whatsoever.  Plaintiffs' claims

that Mayor Linder was part of or participated in any conspiracy are conclusory and unsupported

allegations that must be disregarded under Iqbal, assuming, *arguendo*, that such allegations would

be otherwise sufficient to state a substantive due process violation.

    In sum, plaintiffs' substantive due process claim must be dismissed because they have failed

to plead conduct so egregious as to "shock the conscience."  Furthermore, even if such conduct had

been alleged, plaintiffs have failed to plead sufficient factual averments to raise the involvement of

Mayor Linder and the City of Chester in an alleged scheme to shift plaintiffs' property to the stadium

defendants above the speculative level.  For both of these reasons, plaintiffs have failed to plead a

---

[14]Although plaintiffs allege that Mayor Linder's Financial Disclosure Statement listed no income beyond his earnings as the Mayor, plaintiffs never allege that Mayor Linder received income from any other source, including the Stadium Defendants.  Exhibit A at ¶¶ 58, 28.

substantive due process claim against Mayor Linder and the City of Chester.

**2.** ***Plaintiffs Have Failed to Allege a Violation of their Fifth Amendment Rights.***

Plaintiffs' complaint also claims violations of their Fifth Amendment rights, but does not expound on the basis for that claim. To the extent plaintiffs are alleging violations of their Fifth Amendment due process rights, that claim is fully discussed in the preceding section. It is assumed, however, that plaintiffs are asserting a Fifth Amendment claim for an unconstitutional taking without just compensation. To the extent plaintiffs are asserting such a claim, it must fail.

The Fifth Amendment directs that private property may not "be taken for public use, without just compensation." U.S. Const., Amend V. The Fifth Amendment requires compensation for a temporary taking, but only when "the temporary taking denies a landowner *all use* of his property." Bello, 840 F.2d at 1131, citing, First Evangelical Luther Church of Glendale v. County of Los Angeles, CA, 482 U.S. 304, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987). The situation is "quite different" in the context of "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like...." Id., quoting, First Evangelical, 107 S.Ct. at 2389. When a property owner is only denied the right to put the property to a particular use, but "retain[s] the right to put their land to a variety of alternative uses, the actions of the defendants cannot be said to have denied them all use of their property." Id. at 1131. In such cases, there is no Fifth Amendment taking requiring just compensation.

Additionally, "[a] takings clause claim is 'not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Perano v. Twp. of Tilden, 2010 WL 1462367 (E.D. Pa. Apr. 12, 2010),

53

aff'd., 423 Fed. Appx. 234 (3d Cir. 2011), citing, Williamson Cty. Regl. Planning Commssn. v. Hamilton Bank of Johnson City, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Likewise, "[a takings] claim is not ripe if Plaintiff 'did not seek compensation through the procedures the State has provided for doing so.'" Id., quoting, Williamson, 473 U.S. at 195.

In this case, plaintiffs allege only that they were temporarily deprived of the alleged right to operate public parking lots on their properties on a handful of days. Plaintiffs remained free to use their property for any other purpose. Consequently, plaintiffs have not alleged a Fifth Amendment "taking" without just compensation. Furthermore, even if plaintiffs had alleged a Fifth Amendment taking, plaintiffs allege neither that a final determination was made regarding their use of the property for public parking, nor that they sought compensation for the alleged taking. As such, their Fifth Amendment taking claim would not be ripe, even if a taking had occurred. For these reasons, plaintiffs have failed to allege a viable "taking" claim under the Fifth Amendment, and all section 1983 claims based on alleged violations of the Fifth Amendment must be dismissed with prejudice.

### 3. *Plaintiffs Have Failed to Plead a Viable "Monell" Claim for Municipal Liability Against the City of Chester.*

Initially, a viable section 1983 claim against a municipality cannot be maintained if there is no underlying constitutional violation. Brown v. Com., 318 F.3d 473, 482 (3d Cir. 2003), citing, Collins v. City of Harker Heights, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.E.2d. 261 (1992). As such, if the Court finds that plaintiffs have failed to plead a violation of their constitutional rights, it need not conduct a Monell analysis. Even if, however, plaintiffs had pled viable Fourteenth or Fifth Amendment section 1983 claims against the individual defendants, plaintiffs section 1983 claim against the City of Chester (the only claim against the City) must still be dismissed because

plaintiffs have failed to allege any facts supporting the proposition that plaintiffs' supposed constitutional violations were caused directly by a policy or custom of the City of Chester.

As discussed above, "a municipality cannot be held liable *solely* because it employs a tortfeasor...." Monell, 436 U.S. at 691, 98 S.Ct. at 2036.  A municipality may only be held liable when the unconstitutional conduct by the state-actor "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." Id. at 690, 98 S.Ct. at 2035-36.

There are two potential paths to municipal liability - policy or custom. "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict.'" Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990), quoting, Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299 (1986).  "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials are so permanent and well settled' as to virtually constitute law." Id., quoting, Monell, 436 U.S. at 690, 98 S.Ct. at 2035.  Regardless of whether a plaintiff pursues the claim on custom or policy grounds, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy, or through acquiescence, for the custom." Id. (emphasis added).  Whether one is a "policymaker" turns on "which official has final, unreviewable discretion to make a decision or take an action." Id. at 1481.  Even if a policy or custom exists, a plaintiff must also show that "**there is a direct causal link** between a municipal policy or custom and the alleged constitutional deprivation." Collins, 503 U.S. at 123, 112 S.Ct. at 1067 (citations omitted, emphasis added).

55

Monell liability may attach when the failure to adequately train employees in an otherwise constitutional procedure amounts to a municipal custom or policy itself, "but only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [the employees] come into contact." City of Canton v. Harris, 489 U.S. 378, 388, 109. S.Ct. 1197, 1204 (1989). Under this rule, it is not sufficient merely to show "that the existing training program for a class of employees... represents a policy for which the city is responsible." Id. at 389, 109 S.Ct. at 1205. Rather, the issue is whether the training program is adequate, and if not, "whether such inadequate training can be justifiably said to be a city policy." Id. at 390, 109 S.Ct. at 1205.

"That a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the [employee's] shortcomings may have resulted from factors other than a faulty training program." Id. at 390-91, 109 S.Ct. at 1206 (citations omitted). Nor can liability be imposed simply because "an otherwise sound program has occasionally been negligently administered." Id. at 391, 109 S.Ct. at 1206. It is also insufficient to show that a particular harm "could have been avoided if an [employee] had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." Id. Liability also fails to attach when an adequately trained employee makes a mistake. Id.

In this case, plaintiff fails to allege any facts suggesting that any claimed violation of plaintiffs' Fourteenth of Fifth Amendment rights was directly caused by an unconstitutional policy or custom adopted by the City of Chester. The sum total of plaintiffs' Monell allegations are as follows:

99.     Defendant, City of Chester has, with deliberate indifference, and with full knowledge of the Defendants' conduct and the purpose of their conspiracy, failed to supervise, restrain and discipline its employees, knowing that

56

injuries to Plaintiffs would be caused by, and were a foreseeable consequence of such deliberate failures.

100.   Defendant City of Chester has with deliberate indifference, failed to adequately train, supervise and discipline its employees concerning the proper use of official positions, City property, the provisions of the Third Class City Code and the provisions of the Pennsylvania Ethics Act.

101.   The Defendant City of Chester, through its highest-ranking officials, had actual knowledge of the violations of the Plaintiffs' rights and continued to assist the Defendants' conspiracy despite that knowledge.

102.   As a direct and proximate result of Defendant City of Chester's actions, Plaintiffs were deprived of the rights, privileges and immunities guaranteed them by the Fifth and Fourteenth Amendments to the United States Constitution....

Exhibit A at ¶¶ 99-102.  These conclusory allegations are insufficient to establish an actionable municipal liability claim under <u>Monell</u> and its progeny.

The gravamen of plaintiffs' complaint is that the Mayor, Police Commissioner, and corporate defendants conspired to create a criminal enterprise, and that the parties then used their power to further the interests of that enterprise.  Plaintiffs do not allege that the closures of the lots were undertaken pursuant to a policy or custom ratified by the City of Chester.  Instead, they allege the closures were taken in furtherance of the aims of the enterprise.  Indeed, plaintiffs plead that the conduct of the individual defendants was *in violation of* the Municipal Planning Code and the Chester Home Rule Charter.  Exhibit A at ¶¶ 35, 67.

Furthermore, while plaintiff pleads that the alleged scheme was known by the "highest-ranking officials," presumably referring to Mayor Linder and Commissioner Bail, plaintiffs do not plead that these individuals had final, unreviewable authority to make decisions on zoning matters. Indeed, the Chester Home Rule Charter grants the *Chester City Council* (of which the mayor is but

one member) the authority to "[e]stablish, alter or amend any zoning ordinance, subdivision procedure, land development, land use, or building regulation," 323 Pa. Code § 11.4-401 (actions requiring ordinances); 323 Pa. Code § 11.2-215(D) (empowering city council to adopt ordinances), and "prescribe procedures not inconsistent with this Charter or general law." 323 Pa. Code § 11.2-215(B).

Finally, even if the conduct alleged could be considered a policy or custom of the City, had it been known and acquiesced to by the Mayor, as discussed above, plaintiffs have failed to plead any facts which plausibly establish that Mayor Linder was part of an alleged conspiracy to violate plaintiffs' constitutional rights.  To the extent plaintiffs' baldly allege a lack of training, the complaint is entirely silent regarding the training required, the lack of City training, notice of the need for training, or any facts suggesting that the failure to train was, itself, a City custom or policy.

Plaintiffs have failed to plead that their alleged constitutional violations were caused by a policy or custom adopted or ratified by the City of Chester.  For this additional reason, all section 1983 claims against the City of Chester should be dismissed with prejudice.

**E.**      **Plaintiff's State Law Claims Against Mayor Linder[15] Must Be Dismissed.**

As a high public official, Mayor Linder is entitled to absolute immunity from all state law claims, and those claims should be dismissed.  Even, if Mayor Linder were not immune from suit, plaintiffs' remaining state law claims must still be dismissed for failure to state a claim.

**1.**      ***As a High Public Official, Mayor Linder is Absolutely Immune from Suit on All State Law Causes of Action Alleged Against Him.***

Under Pennsylvania law, "high public officials are immune from suits seeking damages for

---

[15]The state law claims are not directed against the City of Chester.

actions taken or statements made in the course of their official duties." Durham v. McElynn, 565 Pa. 163, 165, 772 A.2d 68, 69 (2001). This common law immunity exists in addition to the immunities granted by the Political Subdivision Tort Claims Act. Id. at 165, 772 A.2d at 69. High public official immunity is an "absolute privilege" to conduct affairs within the scope of the official's duties.

"*Absolute privilege*, as its name implies, **is unlimited**, and exempts a high public official from all civil suits for damages... **even for statements or actions motivated by malice**, provided the... actions are taken in the course of the official's duties or powers and within the scope of his authority...." Id., quoting, Matson v. Margiotti, 371 Pa. 188, 193-94, 88 A.2d 892, 895 (1952) (emphasis original). The rationale behind the rule is that it is "wiser public policy to 'immunize' public officials, for to permit... suits, where the charges turn out to be false, would be to deter all but the most courageous or the most judgment proof public officials from performing their official duties...." Durham, 565 Pa. at 166, 772 A.2d at 69, quoting, Matson, 371 Pa. at 203, 88 A.2d at 899-900. In other words, "[t]his sweeping immunity is 'not for the benefit of the high public officials, but for the benefit of the public.'" Lindner v. Mollan, 544 Pa. 487, 491, 677 A.2d 1194, 1196 (1996) (citations omitted).

High public official immunity has its genesis in defamation cases, but as been extended to apply to any suit arising out of the high official's duties. See Jonnett v. Bodick, 431 Pa. 59, 244 A.2d 751 (1968) (applying high official immunity to incorrect advice by township supervisor that a proposed land use would comply with zoning ordinances); Durham, *supra* (applying high public official immunity to constitutional rights violations for prosecution of criminal charges). The doctrine has been frequently applied to suits such as those at issue in this matter.

For example, in <u>Lindner</u>, *supra*, the Supreme Court of Pennsylvania reaffirmed the doctrine of high public official immunity, finding that the mayor of Yeadon Borough was a high public official and was immune from a slander and libel suit following his public accusation at a borough council meeting that another borough council member was stealing public funds.  544 Pa. at 498, 677 A.2d at 1199.  Likewise, in <u>Schroek v. Pa. State Police</u>, 26 Pa. Cmwlth. 41, 362 A.2d 486 (1976), the Commonwealth Court found that the State Police Commissioner and a police captain were high public officials immune from claims for invasion of privacy, false arrest, and malicious prosecution.  In so doing, it affirmed the trial court's dismissal of these defendants on preliminary objections.  Thus, it is clear that high public official immunity shields high public officials for plaintiffs' claims for civil conspiracy, fraud, trespass, and intentional interference with contractual relations.

"The standard used to determine who qualifies as 'high public official' ...focus[es] on the nature of the duties of the particular public officer, the importance of his office, and whether or not he has policy-making functions."" <u>Durham</u>, 565 Pa. at 166, 772 A.2d at 69, <u>citing</u>, <u>Lindner</u>, 544 Pa. at 495, 677 A.2d at 1198.  While it is frequently the case that "high public officials" have policy making functions, "that is not the sole overriding factor in determining the scope of immunity." <u>Durham</u>, 565 Pa. at 167, 772 A.2d at 70.  Instead, the primary factor is "the public interest in seeing that the official not be impeded in the performance of important duties that is pivotal." <u>Id</u>.  That being said, "public interest does not demand that all public officials be entitled to absolute privilege, but only that 'high-ranking officers' be so protected.'" <u>Lindner</u>, 544 Pa. at 495, 677 A.2d at 1197-98.  In <u>Lindner</u>, *supra*, the Supreme Court surveyed prior cases, noting that "high public official" status had been accorded to mayors, revenue commissioners, school superintendents, borough counsel

60

presidents, a deputy commissioner of public property, a city architect, a township supervisor, the Pennsylvania attorney general, a county attorney, a city comptroller, a superintendent of the parole division of the board of probation, a district attorney, and an assistant district attorney. Linder, 544 Pa. at 496-97, 667 A.2d at 1198-99 (collecting cases).

In this case, the City's mayor is clearly a high public official. There have been several cases finding that mayors are high public officials. Lindner, 544 Pa. at 495, 677 A.2d at 1198-99 (finding that a mayor is a high public official); Suppan v. Kratzer, 660 A.2d 226 (Pa. Cmwlth. 1995) (mayor is a high public official); Factor v. Goode, 149 Pa. Cmwlth. 81, 612 A.2d 591 (1992) (Mayor of Philadelphia is a high public official). Indeed, in Lindner, the Supreme Court observed that "[t]here is no more important local public official than a mayor...." Lindner, 544 Pa. at 496, 677 A.2d at 1198. Thus, there is no question that Mayor Linder is a high public official. As such, he is entitled to absolute immunity for the conduct alleged in the suit, and all state common law claims against him should be dismissed with prejudice.

### 2.    *Plaintiffs Have Failed to Allege Common Law Fraud.*

Count V of plaintiffs' complaint alleges common fraud. To state a common law cause of action for fraud, plaintiffs must establish: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Gibbs v. Ernst, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994) (citations omitted).

In this case, plaintiffs allege that the defendants committed fraud by "misrepresenting... that the lots were operating in violation of the law; by closing the lots in violation of settled Pennsylvania

law; by fraudulently imprisoning and intimidating customers of the Plaintiffs' parking lots with crime scene tape...; and by fraudulently holding out Police Commissioner Bail[] and his three top officers of the Chester City police department as acting on behalf of the City of Chester and people of Chester when they were in fact working on behalf of Defendants' unlawful enterprise." Exhibit A at ¶ 109.  None of this alleged conduct amounts to "fraud."

The essence of plaintiffs' "fraud" allegations are that the various defendants lied *to the public* in order to dissuade the public from visiting plaintiffs' parking lots and, as a consequence, deprived plaintiffs of business.  Plaintiffs do not allege that any misrepresentations were made to them, that they relied on any alleged misrepresentations, or that they took any action to their detriment in response to these misrepresentations.  To the contrary, plaintiffs took legal action to enforce their claimed rights whenever they were confronted with an alleged misrepresentation by the defendants. Consequently, plaintiffs have failed to plead a viable claim for common law fraud.

### 3. *Plaintiffs Claims for Civil Conspiracy, Trespassing, and Intentional Interference with Contractual Relations Must be Dismissed.*

Count IV of plaintiffs' complaint alleges a cause of action for Civil Conspiracy.  Civil Conspiracy, however, is not a cause of action in and of itself.  Rather, it is a means of imputing liability on one for a tort or other wrong committed by another.  Boyanowski v. Capital Area Intermediary Unit, 215 F.3d 396, 407 (3d Cir. 2000).  Furthermore, as discussed above, plaintiffs have failed to plausibly plead the existence of a conspiracy involving Mayor Linder.  Consequently, plaintiffs' civil conspiracy claim must be dismissed.

Counts VI and VII assert causes of action for Trespass and Intentional Interference with Contractual Relations, respectively.  Plaintiffs do not allege that Mayor Linder actively took part in

either of these alleged torts. Rather, plaintiffs seek to impose liability on the Mayor as part of the alleged conspiracy to commit these acts. Since plaintiffs have failed to plead the existence of a conspiracy, these causes of action must also be dismissed.

**F.      Alternatively, All Punitive Damages and RICO Treble Damage Claims Against the City of Chester Must be Dismissed.**

If plaintiffs' claims against the City of Chester survive, all claims for treble damages under the RICO Act, and all claims for punitive damages against the City of Chester must be dismissed.

Plaintiffs' claim for treble damages under the RICO Act are easily dispatched. Plaintiffs do not assert a RICO cause of action against the City. Exhibit A at Count I. Consequently, plaintiffs cannot recover RICO treble damages against the City of Chester, and those claimed damages must be dismissed with prejudice.

As to plaintiffs' claim for punitive damages, it is well established that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Likewise, the Pennsylvania Political Subdivision Tort Claims Act (PSTCA) immunizes a "local agency," such as the City of Chester, from liability for punitive damages under plaintiffs' common law causes of action. 42 Pa. Cons. Stat. Ann. § 8553 (limiting damages recoverable against a local agency to those for pain and suffering, past and future wage loss, medical and dental expenses, loss of consortium, loss of support, and property damage); Marko by Marko v. City of Philadelphia, 131 Pa. Cmwlth. 574, 577, 576 A.2d 1193, 1194 (1990) (punitive damages are not recoverable against a municipality under the PSTCA). Consequently, plaintiffs' claims for punitive damages against the City of Chester must also be dismissed with prejudice.

G.     **Alternative Motion for More Definite Statement Pursuant to Federal Rule of Civil Procedure 12(e).**

Federal Rule of Civil Procedure 12(e) permits a party to seek "a more definite statement of a pleading to which a responsive pleading is allowed, but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. Pro. 12(e).   Allegations of time and place are material when testing the sufficiency of a pleading.   Fed. R. Civ. Pro. 9(f).   If the Court determines that plaintiffs have pled viable causes of action, moving defendants seek a more definite statement on several issues.

First, plaintiffs must state the exact means by which they claim they acquired the rights to operate public parking lots on their properties, the dates the rights were acquired, and the properties to which the rights applied.   For example, plaintiffs allege that they obtained a variance to operate parking lots on three of their properties, but fail to state the date on which the variances were granted, or identify the properties for which the variances were granted.   Instead, plaintiffs' complaint is pled to suggest that all properties were of equal status, which does not appear to be the case.   Without this information, defendants are unable to discern when and how plaintiffs claim they obtained the rights to operate parking lots in violation of the pre-existing ordinances.   Without this information, defendants cannot formulate a defense to the claims.

Second, plaintiff must state with particularity the dates upon which certain closures were allegedly made on their properties and, more importantly, identify the particular properties closed on each particular date.   This information is vital for two reasons.   First, if closures were enforced on properties for which plaintiffs did not have a right to operate a parking lot (for example, by way of variance), the defendants could not have violated plaintiffs' rights in allegedly closing those lots.

64

Plaintiffs' attempts to refer to all of their twenty separate properties generically and collectively is inappropriate and prejudicial to the defendants. Indeed, it is not possible for defendants to respond to allegations that plaintiffs "properties" were closed, without a reference to the property or properties at issue.

Furthermore, identification of the properties is necessary to determine whether and to what extent each of the plaintiffs' individual companies have standing to claim damages. Each of the plaintiff business entities owns separate parcels of land. For example, T.I.B.C. Partners, L.P., cannot seek damages for the closure of a lot owned and operated by T.I.B.C. Bay Partners, LP. Since, however, plaintiffs have lumped all properties and all plaintiffs together as if they were one entity and one property, it is impossible for the defendants to determine which plaintiff is claiming damages for which property, for closures on which unspecified dates.

For these reasons, if plaintiffs have stated valid claims, they should be required to provide a more definite statement identifying: (1) the dates upon which closures were allegedly made on each of plaintiffs' properties; (2) the specific properties on which the closures were made on each date; (3) the manner in which plaintiffs contend they gained the right to operate public parking lots on each of their discrete properties; and (4) the dates upon which they claim to have obtained those rights for each property.

IV.   **CONCLUSIONS**

All of plaintiffs' claims against Mayor Linder and the City of Chester must be dismissed. Primarily, this is because plaintiffs have failed to plausibly plead the presence of a conspiracy to deprive them of their property, which is a necessary predicate for all of their claims.  Additionally, plaintiffs' civil RICO claim must be dismissed because plaintiffs have failed to plead a pattern of predicate acts necessary to make out a RICO cause of action, and have failed to plead the existence of a RICO enterprise.  Plaintiffs' section 1983 claims must be dismissed because plaintiffs have failed to plead violations of their procedural or substantive due process rights under the Fourteenth Amendment, or their right to just compensation for a "taking" under the Fifth Amendment.  Plaintiffs have further failed to allege that any alleged constitutional violation was caused by a policy or custom of the City of Chester.  Plaintiffs' common law claims against Mayor Linder must be dismissed because he is a high public official entitled to absolute immunity for all state causes of action.  Moreover, plaintiffs have failed to plead the existence of common law fraud, and all other state law claims presuppose the presence of Mayor Linder's involvement in a conspiracy, which has not been sufficiently pled.  Alternatively, if plaintiffs have pled viable claims against the City, all claims for RICO treble damages and punitive damages against the City must be dismissed.

Finally, if plaintiffs have pled viable causes of action, moving defendants seek a more definite statement reciting: (1) the dates upon which closures were allegedly made on each of plaintiffs' properties; (2) the specific properties on which the closures were made on each date; (3) the manner in which plaintiffs contend they gained the right to operate public parking lots on each of their discrete properties; and (4) the dates upon which they claim to have obtained those rights for each property.

Respectfully submitted,

**BENNETT, BRICKLIN & SALTZBURG LLC**

BY: _____
EDWARD J. BRADLEY, JR.
NICHOLAS A. CUMMINS
Identification Nos. 73943 / 203238
1601 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 561-4300
bradley@bbs-law.com / cummins@bbs-law.com
Attorneys for defendants, The City of Chester and
Mayor John A. Linder

Date:   September 9, 2014

67

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| T.I.B.C. PARTNERS, L.P., : | |
| T.I.B.C.  PARTNERS, LP, : | CIVIL ACTION |
| T.I.B. PARTNERS, LP, : | |
| T.I.B.C. BAY PARTNERS, LP : | |
| vs. : | |
| THE CITY OF CHESTER, : | |
| JOHN A. LINDER, Mayor : | |
| JOSEPH BAIL, JR., Police : | NO. 14-CV-03697 |
| Commissioner, KEYSTONE : | |
| SPORTS AND ENTERTAINMENTS, LLC, : | |
| FC PENNSYLVANIA STADIUM LLC, : | |
| PENNSYLVANIA PROFESSIONAL : | |
| SOCCER, LLC, GLOBAL SPECTRUM, INC., : | |
| DAVID P. DEBUSSCHERE AND MICHAEL : | |
| SCANLON : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing motion to

dismiss was served upon all interested counsel on this date by electronic filing with the court, or by

regular mail, postage pre-paid, addressed as follows:

Hugh A. Donaghue, Esquire
Kathryn L. Labrum, Esquire
Donaghue & Labrum LLP
13 West Third Street
Media, PA  19063

Suzanne McDonough, Esquire
Holsten & Associates
One Olive Street
Media, PA  19063

Gerald E. Arth, Esquire
Matthew Olesh, Esquire
Stephanie Resnick, Esquire
Fox Rothschild LLP
2000 Market Street
20th Floor
Philadelphia, PA  19103-3222

Arthur W. Lefco, Esquire
Alesia S. Sulock, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
2000 Market Street
Suite 2300
Philadelphia, PA  19103

**BENNETT, BRICKLIN & SALTZBURG LLC**


BY: _____
EDWARD J. BRADLEY, JR.
NICHOLAS A. CUMMINS
Identification Nos. 73943 / 203238
1601 Market Street, 16th Floor
Philadelphia, PA 19103
(215) 561-4300
bradley@bbs-law.com / cummins@bbs-law.com
Attorneys for defendants, The City of Chester and
Mayor John A. Linder

Date:   September 9, 2014