**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **T.I.B.C. PARTNERS, LP, et al.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **NO.  14-3697** |
| | : | |
| **THE CITY OF CHESTER, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                                                  **April 19, 2016**

## MEMORANDUM OPINION

This case involves a dispute over the use of a commercial parking facility in Chester, Pennsylvania.  Plaintiffs, collectively referred to hereinafter as "TIBC,"[1] own and operate the lots in question which are used for events at PPL Park, the home stadium of the Philadelphia Union professional soccer club ("the Union").

Plaintiffs have sued The City of Chester and Chester Mayor John A. Linder (collectively referred to as the "City Defendants"); Chester Police Commissioner Joseph Bail, Jr.;[2] the owners and operators of the Union (Keystone Sports and Entertainments, LLC, FC Pennsylvania Stadium LLC, Pennsylvania Professional Soccer LLC, and its Executive Vice President David P. Debusschere, collectively referred to as the "Keystone Defendants"); and the management company which operates PPL Park (Global Spectrum, Inc., and its General Manager, Michael

---

[1] Plaintiffs are: T.I.B.C. Partners, L.P., T.I.B.C. Depot Partners, L.P., T.I.B. Partners, L.P., and T.I.B.C. Bay Partners, LP.

[2] Although Defendant Commissioner Bail was employed by the City of Chester during the relevant time period, he is represented by different counsel and has filed a separate motion to dismiss from the City of Chester and Mayor Linder.

Scanlon, collectively referred to as the "Global Spectrum Defendants").  Plaintiffs allege that these Defendants conspired to cause economic injury to their parking business.

Plaintiffs have brought two federal causes of action – a Racketeer Influence and Corrupt Organizations Act ("RICO") claim under 18 U.S.C §§ 1961, et seq., and a civil rights procedural due process claim pursuant to 42 U.S.C. § 1983 ("Section 1983") – as well as numerous state law claims.[3]

Before me are four motions to dismiss, filed by each set of Defendants.  For the following reasons, I will grant all of the motions to dismiss, but I will allow Plaintiffs to file a motion to amend their complaint within thirty days as to the RICO claim against Defendant Police Commissioner Bail, the Keystone Defendants, and the Global Spectrum Defendants.

## I.     FACTUAL AND PROCEDURAL HISTORY

The following facts, taken from the complaint and viewed in the light most favorable to Plaintiffs, are as follows:

In 2010, the Union played their inaugural season in the newly constructed PPL Park in the City of Chester.  On December 20, 2011, Plaintiffs acquired twenty-one parcels of land in the immediate vicinity of PPL Park, twenty of which they planned to use for stadium parking.  None of these parcels were zoned for a paid, public parking lot.  (Compl. ¶¶ 18-20; Exh. A.)

On January 17, 2012, Plaintiffs filed an application for a variance with the City of Chester Zoning Department to use the parcels as public parking.  On February 16, 2012, a hearing was held before the City of Chester Zoning Hearing Board, which was continued to

---

[3] Plaintiffs bring the RICO claim against Defendant Police Commissioner Bail, the Keystone Defendants, and the Global Spectrum Defendants.  Plaintiffs bring the Section 1983 claim against all Defendants, and they bring the state law claims against all Defendants except the City of Chester.

March 15, 2012.  On March 14, 2012, Plaintiffs entered into a written agreement with the City, which provided that the City would "issue temporary Off-Street Parking Permits for the calendar year 2012 to permit off-street parking in the Properties for use by [Plaintiffs] as public parking facilities."  The agreement also provided that Plaintiffs would "postpone the applications for variances [] presently scheduled to be heard before the City of Chester Zoning Hearing Board on March 15, 2012, without prejudice as to the position of the City of Chester or [Plaintiffs] as to the zoning status of the properties."  (Id. ¶¶ 20-23; Exh. B.)

On March 14, 2012 and March 18, 2012, Plaintiffs used the parcels as paid parking for events at PPL Park.  However, on April 26, 2012, forty-eight hours before a Union match, Plaintiffs were served by a City of Chester employee with a notice of violation and a cease and desist order, signed by the Planning Director for the City.  The notice declared that Plaintiffs were in violation of a City zoning ordinance which requires that the use of a temporary parking lot "'be conducted in a manner consistent with public safety and all traffic laws.'"  The notice specifically stated that "[t]he pedestrian traffic to and from your lots [] poses a continuing danger due to the absence of sidewalks," that the "lot attendants have . . . posted false and/or misleading signage indicating that your lots are 'AUTHORIZED' . . . [and] have been excessively aggressive in diverting parking from the PPL [stadium-owned] lots by making false or misleading statement about the PPL lots being full," which has "contributed to [] traffic jams, delays and congestion."  Plaintiffs were ordered to cease and desist the use of their parking lots until further notice, and warned that City police would be enforcing the order "commencing immediately."  (Id. ¶¶ 25-26; Exh. C.)

Plaintiffs filed an appeal of the April 26, 2012 cease and desist order to the City zoning board and a hearing was scheduled for June 12, 2012.  Plaintiffs opened their lots for public

3

parking three times before the hearing, on May 13, 2012, May 29, 2012, and June 3, 2012.  On June 7, 2012, the City issued a second violation notice.  The notice stated that because the parcels were not located in a zoning district that was authorized for use as public parking, "[a]ny permits or agreements providing for temporary parking on the Lots are not authorized by the Zoning Ordinance and are therefore null and void."  The notice further directed that Plaintiffs "must apply for and obtain a variance from the Zoning Hearing Board" should they "desire to use the Lots for temporary parking."  (Id. ¶¶ 31, 36-37; Exhs. D-E.)

On June 12, 2012, the scheduled date of the appeal hearing, Plaintiffs entered into another agreement with the City of Chester, which was memorialized into a stipulated order and entered by the Delaware County Court of Common Pleas.  The agreement provided that the City would lift the cease and desist order dated June 7, 2012, Plaintiffs would continue to use the parcels as public parking pursuant to the March 14, 2012 agreement, and that Plaintiffs would revive their application for a variance for which a hearing would be held before the City zoning board as soon as practicable.  From June 12, 2012 to October 1, 2012, Plaintiffs conducted their parking business on their properties without incident.  (Id. ¶¶ 41-42; Exh. F.)

On October 16, 2012, Plaintiffs filed a declaratory judgment action in the Delaware County Court of Common Pleas against the City asking for a judgment declaring that Plaintiffs' use of at least some of the parcels as parking lots was a lawful continuance of the prior non-conforming use of the parcels (the lots had previously been used for trash hauling and storage).  On February 19, 2013, the Keystone Defendants filed a petition to intervene in the action arguing that "[a]s owners and operators of the Union and as lessees of PPL Park, Petitioners are entitled to the proceeds generated by parking in the PPL lots during Union home soccer matches and other PPL Park events."  The City supported the motion to intervene, writing in its answer that

4

"[t]his dispute in large part relates to a dispute between the Plaintiffs and proposed Intervenors. The City believes that allowing intervention will further the ultimate resolution of this matter and conserve judicial resources."  (Id. ¶¶ 43-45; Exhs. G-I.)

On March 2, 2013, the date of the Union season home opener, and while the declaratory judgment action was pending, Plaintiffs' lots were closed down by the City of Chester police department.  Certain streets which led to Plaintiffs' lots were blocked with City vehicles, and the entrances to the lots were cordoned off by the City police department with yellow "Crime Scene – Do Not Cross" tape.

On March 12, 2013 Defendant Debusschere, on behalf of the Keystone Defendants, wrote a letter addressed to Defendants Mayor Linder and Police Commissioner Bail.  In the letter, Defendant Debusschere thanked the mayor and the police commissioner for "mak[ing] sure that everyone running parking operations near PPL Park all 'play by the rules,'" and for having "aided in the unpermitted lot closures" on March 2, 2013.  Defendant Debusschere also referenced a March 9, 2013 lacrosse event at PPL Park, and "characterize[d] the overall parking enforcement as less than a success and perhaps a small step backwards from the March 2nd Union game."  Defendant Debusschere "estimate[d] that approximately 250 cars were allowed to park in unpermitted TIBC lots resulting in approximate lost revenue to PPL Park of $3,750 ($15 per car) and there were several instances of aggressive behavior by TIBC parking attendants." (Id. ¶¶ 46-47; Exh. J.)

On March 16, 2013, Plaintiffs' lots were again closed by City police.  On March 20, 2013, Defendant Debusschere sent a letter to Defendants Mayor Linder and Commissioner Bail thanking them for their "continued efforts to enforce the parking regulations around PPL Park at the March 16, 2013 [] Union game."  Defendant Debusschere remarked that "[t]he efforts of the

City and Police to mobilize staff to block off the various roads and driveways leading to unpermitted lots which attempted to open was clearly evident with various barriers, tape and vehicles placed in strategic locations."  Defendant Debusschere then highlighted various "areas [Plaintiffs] are using which they don't have zoning variances for, or that are simply not theirs," and declared that "[i]t is clear that [] [Plaintiffs] continue to try and circumvent the enforcement efforts of the City and Police and we request that [Plaintiffs] be at a minimum cited for these actions and if it continues additional measures be taken to stop these practices."  Defendant Debusschere further stated that "it has come to our attention that the TIBC lot owners are attempting to lease or purchase various parcels of land adjacent to their lots," and "that even if TIBC acquires the rights to the various properties . . . [they] should still be shut down absent obtaining the appropriate variances from the Chester Zoning Hearing Board."  (Id. ¶¶ 46,48; Exh. K.)

Plaintiffs' lots were shut down again during PPL Park events on April 13, 2013 and May 4, 2013.  On May 13, 2013, a hearing was held in the Delaware County Court of Common Pleas on Plaintiffs' petition for injunctive relief.  Following the hearing, the court ordered that "[t]he City of Chester shall immediately cease and desist from interfering in any fashion with Plaintiffs' lawful operation of their parking facilities both prior to and after events at the PPL Park, including but not limited to interfering in any fashion with both the entrances and exits from those facilities until further Order of this Court."  Although the Keystone Defendants appealed that decision to the Pennsylvania Commonwealth Court, the appeal was discontinued on January 14, 2014.  Finally, on March 15, 2014, and just after half time during a Union game, City police officers came onto the TIBC lots and barricaded every exit and parking row with yellow "Crime Scene – Do Not Cross" tape.  (Id. ¶¶ 46, 50-55; Exhs. L-M.)

6

Plaintiffs initiated this action on June 16, 2014.[4]  Plaintiffs allege that Defendants formed part of an "illegal conspiracy" from March 2012 to Spring 2014, the purpose of which was "to injure the Plaintiffs' business . . . to such an extent that the patrons would never again park on Plaintiffs' lots, to obtain Plaintiffs' patrons for themselves and to eventually obtain Plaintiffs' property for themselves at a fraction of its value."  Plaintiffs' complaint also states that "Defendant Police Commissioner Bail and his three top Police Department officers were W-2 Employees of Global Spectrum, Inc., from March of 2012 through the Spring of 2014, being paid $400 dollars for each event at PPL Stadium," and that Defendant Commissioner Bail failed to disclose this income on his Statement of Financial Interest Form as required by 65 Pa.C.S. § 1105(a).  (Id. ¶¶ 57-61.)

As noted above, Plaintiffs have brought a civil RICO claim against Defendant Police Commissioner Bail, the Keystone Defendants, and the Global Spectrum Defendants (Count I), and a Section 1983 due process claim against these Defendants, Defendant Mayor Linder, and the City of Chester, on a Monell theory of liability (Count II).[5]  Plaintiffs have also alleged state law claims against Defendant Linder, Defendant Bail, the Keystone Defendants, and the Global Spectrum Defendants: civil conspiracy (Count IV), fraud (Count V), trespass (Count VI), and intentional interference with contractual relations (Count VII).  All four sets of Defendants have filed a motion to dismiss.

---

[4] This matter was initially assigned to the Honorable Edmund V. Ludwig and was reassigned to my docket after the motions were fully briefed.

[5] Plaintiffs also bring a claim under 42 U.S.C. § 1988, which provides for attorneys' fees for a prevailing plaintiff in a Section 1983 civil rights action (Count III).  Because Plaintiffs' entitlement to attorneys' fees will rise and fall with the Section 1983 claim, I need not address this claim separately.

## II.   **STANDARD OF REVIEW**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully."  Id.  To determine the sufficiency of a complaint under Twombly and Iqbal, the Court must take the following three steps: (1) the Court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Burch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## III.   **LEGAL ANALYSIS**

### A.  **The Federal Claims**

#### 1.  **The RICO Claim**

Plaintiffs bring a RICO claim against Defendant Police Commissioner Bail, the Keystone Defendants, and the Global Spectrum Defendants.[6]   It is alleged that these Defendants

---

[6] Plaintiffs have also brought a RICO claim against Defendant Mayor Linder.  However, subsequent to the December 8, 2015 oral argument, and pursuant to the stipulation between Plaintiffs and Defendant Linder, the RICO claim against Defendant Linder was dismissed with prejudice.  (N.T. 12/08/15 at 49); (Doc. no. 59.)

In addition, I note that Plaintiffs have not brought a RICO claim against the City of Chester. Municipalities are indeed immune from suit under RICO.  Genty v. Resolution Trust Corp., 937 F.2d 899, 914 (3d Cir. 1991) (explaining that the mandatory treble damages provision of RICO, "which are punitive in character . . . [violate] the long-established and salutary principle of common law prohibiting punitive damages against municipalities.").

"knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the unlawful closing of Plaintiffs' lots, issuance of false notices of violations and meritless court actions and appeals through a pattern of racketeering activities."  Plaintiffs explain that the object of this conspiracy, which lasted from March 2012 to Spring 2014, was to "obtain an unfair and illegal advantage in obtaining parking lot customers who would park at Plaintiffs' lots and to force the Plaintiffs out of business in the City of Chester so that the Defendants could obtain the Plaintiffs' property for less than fair market value."  (Compl. ¶¶ 18-20.)

Section 1962(c) of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  In order to state a RICO claim, the complaint must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).  Defendants argue that Plaintiffs have failed to sufficiently plead any of these elements.

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The Supreme Court has established an expansive understanding of this definition, observing that "[t]he [RICO] statute does not specifically define the outer boundaries of the 'enterprise' concept," and that "this enumeration of included enterprises is obviously broad, encompassing 'any . . . group of individuals associated in fact.'"  Boyle v. U.S., 556 U.S. 938, 944 (2009) (quoting § 1961(4)) (emphasis in Boyle); see also In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 366 (3d Cir. 2010) ("[T]he

9

Boyle Court highlighted several elements of the RICO statute that pointed toward a capacious construction of the term.")

Here, Plaintiffs allege the existence of an association-in-fact enterprise.  This type of enterprise "'must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to pursue the enterprise's purpose.'"  In re Ins. Brokerage Antitrust Litig., 618 F.3d at 366 (quoting Boyle, 556 U.S. at 946).  While this "enterprise" element remains distinct from the "racketeering activity" element, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'"  Id. at 368 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).  In this regard, "'proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer existence of an association-in-fact enterprise.'"  Id. (quoting Boyle, 556 U.S. at 951).  Because Plaintiffs do not allege an ascertainable structure which is wholly distinct from the racketeering activity, I will focus my "enterprise" analysis by reviewing the pled facts alleging a "pattern of racketeering activity."

"Racketeering activity," as defined by the RICO statute, is not so much a definition as a list of offenses which can serve as a predicate offense for establishing a RICO claim.  Included in this list is "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year; [] any act which is indictable under [] the following provisions of title 18 United States Code: [] section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)."  18 U.S.C. § 1961(1).  Further, and pursuant to the RICO statute, a "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . the last of which occurred within ten years [] after the commission of a prior act of racketeering

10

activity."  18 U.S.C. § 1961(5).   Here, Plaintiffs allege that Defendants' actions constituted

violations of the state law bribery statute and the federal mail and wire fraud statutes.[7]

Plaintiffs' bribery allegations center around the payments which were made by Defendant

Global Spectrum, the management company which operates PPL Park, to Defendant Police

Commissioner Bail and three top Police Department officers.  Plaintiffs allege that Defendant

Bail and the three officers "were W-2 Employees of Global Spectrum, Inc., from March of 2012

through the Spring of 2014, being paid $400 dollars for each event at PPL Stadium."  (Compl.

¶¶ 57, 59.)  Plaintiffs contend that these payments were violations of 18 Pa.C.S. § 4701(a)(1),

which prohibits "[b]ribery in official and political matters."  Under this statute

> A person is guilty of bribery, a felony of the third degree, if he
> offers, confers or agrees to confer upon another, or solicits, accepts
> or agrees to accept from another:
>
> (1) any pecuniary benefit as consideration for the decision,
> opinion, recommendation, vote or other exercise of discretion as a
> public servant, party official or voter by the recipient[.]

18 Pa.C.S. § 4701 (a)(1).

Plaintiffs urge that these payments formed the core of the conspiracy, having been made

"in exchange for the use of [Defendant Bail's] official office, city employees, vehicle, and

authority, by which the co-conspirators oppressed and illegally confiscated Plaintiffs' property

and injured their business."  Plaintiffs further contend that the federal mail fraud and wire fraud

statutes are implicated because the illicit payments were transferred to Defendant Commissioner

---

[7] Plaintiffs also allege a violation of a federal bribery statute, 18 U.S.C. § 201, a RICO predicate
act which proscribes the "[b]ribery of public officials," defined by the statute to include only
federal officials.  (Compl. ¶ 85.)  In their motions, Defendants argue that, because there are no
allegations that any federal officials were involved in the events which give rise to this litigation,
they cannot be said to have violated the federal bribery statute. I agree, and further note that
Plaintiffs do not respond to this argument.

Bail by wire, and the W-2 forms were provided to him by mail.[8]  (Compl. ¶¶ 79, 85.)  While none of the Defendants dispute that the payments were made, Defendant Bail contends that Plaintiffs' allegations of state law bribery and thus mail and wire fraud fail as a matter of law because Plaintiffs have failed to properly allege that the payments were anything more than "extra duty event compensation from the business who was then generating the need for police enforcing activities at the stadium."  (Def. Bail's MTD at 22.)

Defendant Bail is correct that arrangements for a private business to incur the costs of police staffing are commonplace.  See, e.g., One Three Five, Inc. v. City of Pittsburgh, 951 F.Supp.2d 788, 792 (W.D. Pa. 2013) (describing such a relationship between a private business and the Pittsburgh Police Department).  However, it is important to keep in mind that this case is at the pleading stage.  While it could ultimately be proven that the payments were proper, at this stage, where the facts are viewed in Plaintiffs' favor, I cannot conclude that the payments from Defendant Global Spectrum to Defendant Bail and the other officers were simply extra duty compensation, as opposed to a pecuniary benefit to improperly close or deny access to Plaintiffs' parking facilities.

That said, I must still consider whether Plaintiffs' factual allegations are sufficient for a factfinder to infer a nexus between the payments and the lot closures which would give rise to bribery.  This topic was expanded upon at oral argument, where I asked Plaintiffs' counsel to specifically point out which paragraphs of the complaint support their allegations that there was a direct connection between the payments and the lot closures.  (N.T. 12/08/15 at 9.)  Counsel focused on portions of their complaint alleging that Defendants violated several state laws,

---

[8] Because the commission of the mail and wire fraud offenses are in large part dependent on the commission of the underlying RICO predicate act, i.e., bribery, I need not discuss the mail and wire fraud allegations in detail here.

including laws which govern the acceptance and reporting of outside compensation on the part of public officials, and the ability of a municipality to enforce a perceived zoning violation without a hearing.[9]  Plaintiffs posit that these facts provide sufficient circumstantial evidence to plausibly support a claim that the payments were illegal.  (Id. at 10-16 (pointing to Compl. ¶¶ 27, 50).)

After careful review of Plaintiffs' complaint I conclude that even when viewed in the light most favorable to Plaintiffs, these alleged facts do not plausibly plead that bribes occurred. A violation of state laws, which are not RICO predicate acts, standing alone, cannot support the proposition that there was an unlawful connection between the payments and the lot closures. While the alleged closure of the lots without a required hearing could establish a violation of Plaintiffs' state law rights, it does not plausibly create a connection between the payments and the lot closures.

The fact that Defendant Bail allegedly failed to report the income he received from Defendant Global Spectrum on his Statement of Financial Interest Form in violation of 65 Pa.C.S. § 1105(a) does not cure this defect.  Even if this actually occurred, such unreported payments cannot establish that such payments were made in exchange for the lot closures.  In short, Plaintiffs' complaint fails to articulate facts establishing that the payments were made "as consideration" for lot closures.

Plaintiffs also point to the allegations that Defendant Bail retaliated against three Chester police officers when they expressed concerns about the lot closures.  Plaintiffs claim that these

---

[9]  Although they do not explicitly state as such in the RICO count of the complaint, Plaintiffs imply elsewhere that Defendant Bail's alleged violation of 65 Pa. C.S. § 1103(a) and (c) – which prohibit public officials from "engag[ing] in conduct that constitutes a conflict of interest" and from "[a]ccepting improper influence" – in and of itself constitutes a basis for RICO liability. (Compl. ¶¶ 62-63.)  While this statute does govern the accountability of public officials, it does not rise to the level of bribery as would be required for it to constitute a RICO predicate act.

facts provide strong circumstantial evidence of a nexus between the payments and the closures.

(N.T. 12/08/15 at 16-17.)  These allegations state:

> When the three top Chester police officers under Commissioner
> Bail questioned the propriety of the Defendants' actions, they were
> immediately demoted, and Defendant Bail and Linder immediately
> filled their vacant offices [with] three other Chester Police Officers
> who were immediately elevated in rank and placed on the payroll
> of Defendant Global Spectrum, Inc., by Defendant Michael
> Scanlon.

(Compl. ¶ 97.)

There are two problems with the sufficiency of these allegations.  First, they appear in

paragraph 97 of the complaint, which is dedicated to Plaintiffs' Section 1983 constitutional due

process claim (Count II).  Plaintiffs' civil RICO claim however is set out as Count I of the

complaint (paragraphs 69-88), and the factual averments of the later due process claim are not

incorporated by reference into the earlier RICO claim.

The second, more problematic issue is that these allegations are lacking in specificity.

While the demotion of three police officers shortly after they questioned the propriety of closing

Plaintiffs' lots could imply an improper motive on Defendant Bail's part in directing the lot

closures, the allegations as pled neither name the officers nor provide any kind of timeline as to

when the complaint and the demotions occurred.

Given all of the pleading deficiencies discussed above, I will dismiss Plaintiffs' RICO

claim for failure to adequately allege a predicate act of racketeering and an "enterprise."

I note however that in response to the motions to dismiss Plaintiffs have provided the

affidavit of Major Robert Archacki, a twenty-year veteran of the City of Chester Police

Department, who identifies himself as one of the demoted officers.  The affidavit describes the

circumstances surrounding the demotions and the lot closures in further detail.   Had that

14

information been properly incorporated into the complaint, it could have brought Plaintiffs closer

to stating a plausible RICO claim.  Plaintiffs will therefore be afforded thirty days in which to

file a motion for leave to amend the complaint as to the RICO claim.  See Fed. R. Civ. P.

15(a)(2) ("[A] party may amend its pleading with . . . the court's leave.  The court should freely

give leave when justice so requires.").

### 2.  Section 1983 Due Process Claim

Plaintiffs also bring a Section 1983 Fourteenth Amendment denial of due process claim

alleging that Defendants "illegally depriv[ed] Plaintiffs of the lawful use of their business

property without due process of law."[10]  Plaintiffs describe the unconstitutional actions as

"making illicit payments to the Commissioner of Police, falsely imprisoning the Plaintiffs'

business customers, filing False Statement of Financial Interest forms, and causing the issuance

of illegal and improper Notices of violations prohibiting Plaintiffs from lawfully using their

property without any due process hearing."  Plaintiffs allege that "each of the Defendants agreed

with and assisted each of the other Defendants in performing the[se] various actions," and that

the City of Chester is liable on account of its "fail[ure] to adequately train, supervise and

discipline its employees."  (Compl. ¶¶ 89-102.)

Plaintiffs do not specifically plead whether they are pursuing a procedural due process

claim, a substantive due process claim, or both.  They generally state that, "[b]y their actions, the

Defendants have deprived Plaintiffs of rights secured by the [] Fourteenth Amendment[]."

---

[10]  In bringing their due process claim, Plaintiffs also reference the Fifth Amendment.  (Compl.
¶ 98.)  The Fifth Amendment however "only applies to federal officials."  Bergdoll v. City of
York, 515 F. App'x 165, 170 (3d Cir. 2013) (citing Nguyen v. U.S. Catholic Conference, 719
F.2d 52, 54 (3d Cir. 1983)).  Because there are no allegations of actions taken by federal
officials, this claim fails as a matter of law.  See id. (dismissing a Fifth Amendment claim against
various city and county officials for failure to allege wrongdoing on the part of federal actors).

Plaintiffs' complaint explains that Defendants' actions, which were "taken against the Plaintiffs and the Plaintiffs' business," "illegally depriv[ed] Plaintiffs of the lawful use of their business property without due process of law," and "prohibit[ed] Plaintiffs from lawfully using the property without any due process hearing."  Plaintiffs describe their injuries as "hav[ing] suffered the loss of income from their business, damage to their reputation and good will, counsel fees to defend their lawful business, and management fees in 2013 and 2014."  (Id. ¶¶ 90-92, 95, 98.)  Erring on the side of caution, Defendants have interpreted Plaintiffs' complaint as bringing both a substantive and procedural due process claim, and Defendants argue in their motions to dismiss that both of these claims are insufficiently pled.

In order to prove either a substantive or procedural due process claim, a plaintiff must establish a deprivation of life, liberty or property within the meaning of the Fourteenth Amendment.  See, e.g., Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972) (stating the deprivation requirement in the context of a procedural due process claim); DeBlasio v. Zoning Board of Adjustment for Township of West Amwell, 53 F.3d 592, 599 (3d Cir. 1995) (stating the deprivation requirement in the context of a substantive due process claim).  Here, Plaintiffs contend that they were unconstitutionally deprived of their property.

The constitutional meaning of "property" differs considerably between a procedural and a substantive due process claim.  For purposes of a procedural due process claim, the meaning is broad: "[P]roperty interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims to those benefits."  Board of Regents, 408 U.S. at 577; see also Goldberg v. Kelly, 397 U.S. 254 (finding statutory entitlement to welfare benefits such that those benefits are property rights for purposes of a procedural due process

16

claim).  For purposes of a substantive due process claim, the meaning is narrow: "[W]hile property rights for procedural due process purposes are created by state law, substantive due process rights are created by the Constitution," and "only fundamental property interests" are protected.  DeBlasio, 53 F.3d at 599.  While "ownership is a property interest worthy of substantive due process protection," id. at 601, the Third Circuit has emphasized that "[l]and-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper' motives."  United Artists Theatre Circuit, Inc. v. Township of Warrington, PA, 316 F.3d 392, 402 (3d Cir. 2003).  Rather, in order to plead a substantive due process violation in the context of a land-use dispute, a plaintiff must allege that the governmental action amounts to an abuse of official power that "shocks the conscience."  Id. at 401.

With these differences between the meaning of "property" in the context of a substantive and a procedural due process claim in mind, I conclude that Plaintiffs have brought a procedural due process claim only.  Indeed, while Plaintiffs argue generally that "the [r]ights involving the conduct of business are property rights," they articulate those rights as having "stem[med] from an independent source such as State law" (property in the context of a procedural due process claim) rather than being a "fundamental property interest" created by the Constitution itself (property in the context of a substantive due process claim).  (Pls.' Resp. to City Defendants' MTD at 18-19.)  Further supporting my conclusion that Plaintiffs have only brought a procedural due process claim is the fact that Plaintiffs make no reference to the "shock the conscience" standard which is a requirement of substantive due process claims.  United Artists, 316 F.3d at 401.

"When a plaintiff sues under 42 U.S.C. § 1983 for a state actor's failure to provide procedural due process, [the Third Circuit] employ[s] the familiar two-stage analysis, inquiring (1) whether the asserted individual interests are encompassed with the fourteenth amendment's protection of 'life, liberty, or property'; and (2) whether the procedures available provided the plaintiff with 'due process of law.'"   Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (quotations and citation omitted).  With respect to the procedures afforded, "[a] fundamental requirement of due process is the opportunity to be heard . . . at a meaningful time and in a meaningful manner."   Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  Due process is not, however, "a technical conception with a fixed content unrelated to time, place and circumstances."   Matthews v. Eldridge, 424 U.S. 319, 334 (1976).   In this regard, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy is available."   Hudson v. Palmer, 468 U.S. 517, 533 (1984).   The Supreme Court has reasoned that "predeprivation procedures [for negligent and intentional deprivations of property] are simply 'impracticable' since the state cannot know when such deprivations will occur."   Id.

Plaintiffs urge that their procedural due process rights were violated in that they were entitled to and did not receive predeprivation process before the closure of their lots on the dates in question.   Defendants respond that Plaintiffs were not constitutionally entitled to a predeprivation hearing.  Defendants argue that, given Plaintiffs' allegations that the closure of the lots was a result of an unauthorized conspiracy between Defendants, those actions can only be characterized as intentional, and thus a predeprivation hearing is not necessary so long as a constitutionally meaningful postdeprivation remedy was available.   Rather than responding

18

directly to Defendants' argument, and challenging the constitutionality of the postdeprivation process they received, Plaintiffs focus on the state laws which relate to predeprivation process. Plaintiffs contend that because the "[Pennsylvania] Municipalities Planning Code specifies the procedural due process which is afforded to every landowner and requires a pre-determination hearing before any coercive action," "[a] local government's deprivation of a right to a hearing under the Pennsylvania Municipalities Planning Code gives rise to a §1983 claim." (Pls.' Resp. to City Defendants' MTD at 17, 19.)

I do not agree with Plaintiffs that the alleged failure to provide a predeprivation hearing under the Pennsylvania Municipalities Code in and of itself is a constitutional violation. The fact that Defendants' "actions may have been illegal under Pennsylvania law does not mean that they were unconstitutional under the Due Process Clause." Maple Properties Inc. v. Township of Upper Providence, 151 F. App'x 174, 179 (3d Cir. 2005). The state court cases upon which Plaintiffs rely do not refute this point, as they do not bear on the question of whether a violation of state law procedures constitutes a federal civil rights violation. See Berman v. City of Philadelphia, 228 A.2d 189 (Pa. 1967) ("The sole question for our consideration is whether the court below abused its discretion in declining to issue the preliminary injunction [in a zoning dispute].") ; Vernon v. Borough of Darby, 428 A.2d 770 (Pa. Cmwlth. 1981) (same); City of Philadelphia, Board of License & Inspection Review v. 2600 Lewis, Inc., 661 A.2d 20 (Pa. 1995) (examining the constitutional requirements of due process in the context of a denial of a business privilege license).

The one federal case to which Plaintiffs cite – which did in fact find that a failure to provide a hearing in compliance with the Pennsylvania Municipalities Code constituted a due process violation – involved an instance where the municipality refused to provide any hearing at

19

all on a property owner's challenge to a zoning ordinance.  de Botton v. Marple Township, 689

F. Supp. 477 (E.D. Pa. 1988).  The reasoning of de Botton does not apply here because Plaintiffs

have not argued that they were deprived of the postdeprivation process available to them under

the Pennsylvania Municipalities Code.  See Parratt v. Taylor, 451 U.S. 527, 538 (1981)

(recognizing that "postdeprivation remedies made available by the State can satisfy the Due

Process Clause.").  Accordingly, Plaintiffs' procedural due process claim is dismissed.[11]

### B.  State Law Claims

Plaintiffs have also brought state law claims for civil conspiracy (Count IV), fraud (Count

V), trespass (Count VI), and intentional interference with contractual relations (Count VII)

against Defendant Mayor Linder, Defendant Commissioner Bail, the Keystone Defendants, and

the Global Spectrum Defendants.  While all of these Defendants have moved to dismiss the state

law claims, Plaintiffs failed to respond to the motions of Defendants Linder, Bail, and the

Keystone Defendants.  These three Defendants argue that their motions should be granted as

uncontested, and that Plaintiffs' state law claims against them should be dismissed.  At oral

argument, Plaintiffs indicated that they did not oppose the three Defendants' motions as to the

state law claims.  (N.T. 12/08/15 at 42-43.)  Plaintiffs' state law claims against Defendants

Linder, Bail, and the Keystone Defendants are therefore dismissed, leaving the claims against the

Global Spectrum Defendants as the only state law causes of action which remain.

---

[11] In light of my conclusion that Plaintiffs failed to plead the second element of a procedural due process claim (whether the procedures available conformed with the constitutional meaning of due process), I need not address Defendants' argument that Plaintiffs failed to plead the first element of such a claim (whether the asserted individual interests are encompassed within the Fourteenth Amendment's meaning of property), nor need I consider Plaintiffs' argument that the City of Chester should be held liable on a theory of Monell liability for procedural due process violations.

A district court may decline to extend supplemental jurisdiction over a state law claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Whether supplemental jurisdiction will be extended under these circumstances is discretionary. <u>Kach v. Hose</u>, 589 F.3d 626, 650 (3d Cir. 2009). Ordinarily, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988). If a district court decides not to exercise supplemental jurisdiction, it should dismiss the state law claims without prejudice. <u>Kach</u>, 589 F.3d at 650.

Here, I have dismissed both of Plaintiffs' federal claims. As such, the interests of judicial economy, convenience, fairness and comity will not be served by extending supplemental jurisdiction over the state law claims against the Global Spectrum Defendants, and these claims are dismissed without prejudice. Nevertheless, Plaintiffs may include these claims in a proposed amended complaint to be filed with their motion for leave to file an amended complaint as to the RICO claim. In the event that such motion is granted, I will exercise jurisdiction over the state law claims against the Global Spectrum Defendants.

## IV.   <u>CONCLUSION</u>

Although Plaintiffs' civil RICO claim is dismissed as insufficiently pled, Plaintiffs may file a motion for leave to file an amended complaint as to the RICO claim within thirty days. Plaintiffs' procedural due process claim is however dismissed with prejudice, as are the state law claims against Defendant Police Commissioner Bail, Defendant Mayor Linder, and the Keystone Defendants. I have declined to exercise supplemental jurisdiction over Plaintiffs' state law

claims against the Global Spectrum Defendants at this time; Plaintiffs may however include these state law claims in a proposed amended complaint should they file a motion for leave to file an amended complaint as to the RICO claim.  Finally, because all of the claims against the City of Chester and Defendant Linder are dismissed with prejudice, this action is dismissed in its entirety as to these two Defendants.

An appropriate Order follows.