IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| T.I.B.C. PARTNERS, LP, ET AL., | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No. 14-3697 |
| THE CITY OF CHESTER, ET AL., | : | |
| Defendants. | : | |

**Goldberg, J.**                                                          January 29, 2018

## MEMORANDUM OPINION

This case involves a dispute over the use of a commercial parking facility in Chester, Pennsylvania. Plaintiffs, collectively referred to as "TIBC,"[1] own and operate the lots in question, which were used for events at PPL Park, the home stadium of the Philadelphia Union professional soccer club ("the Union").

Plaintiffs originally sued Defendants on June 16, 2014.[2] On April 19, 2016, after receiving four motions to dismiss, I granted the City Defendants' motion and dismissed them from the case entirely. I also granted the motions filed by Defendant Bail, the Keystone Defendants, and the Global Spectrum Defendants. Thereafter I permitted Plaintiffs to file a first

---

[1] Plaintiffs are: T.I.B.C. Partners, L.P., T.I.B.C. Depot Partners, L.P., T.I.B. Partners, L.P., and T.I.B.C. Bay Partners, L.P.

[2] These Defendants are the City of Chester and Chester Mayor John A. Linder (collectively referred to as the "City Defendants"); Chester Police Commissioner Joseph Bail, Jr. ("Defendant Bail"); the owners and operators of the Union (Keystone Sports and Entertainments, LLC, FC Pennsylvania Stadium LLC, Pennsylvania Professional Soccer LLC, and its Executive Vice President David P. Debusschere, collectively referred to as the "Keystone Defendants"); and the management company that operates PPL Park (Global Spectrum, Inc., and its General Manager, Michael Scanlon, collectively referred to as the "Global Spectrum Defendants").

1

Amended Complaint against those three sets of Defendants. Motions to Dismiss the Amended Complaint filed by Defendant Bail, the Keystone Defendants, and the Global Spectrum Defendants are now pending before me. For the reasons that follow, I will grant all three motions and dismiss the Amended Complaint with prejudice.

I.     **FACTUAL AND PROCEDURAL HISTORY**

Most of the facts presented in the Amended Complaint are set out in my April 19, 2016 Memorandum Opinion. (Doc. No. 62.) I incorporate those facts by reference here and note only the facts newly alleged in the Amended Complaint.

The gravamen of Plaintiffs' allegations is that Defendants conspired to cause economic harm by closing Plaintiffs' parking lots. Plaintiffs contend that the Keystone Defendants and the Global Spectrum Defendants paid Defendant Commissioner Bail in the form of wages ($400 per game), free tickets, free food, and free parking for himself and guests "in order to obtain his agreement to use his official status" to close the lots. Plaintiffs aver there was a "Quid Pro Quo understanding that Defendant Bail would use his official position with the City" to further the goals of the conspiracy. (Am. Compl. ¶¶ 31, 56.)

In support of this alleged quid pro quo understanding, Plaintiffs now attach and incorporate the affidavit of Major Robert Archacki, who attests that he was a member of the Chester City Police Department in 2011, 2012, and 2013. Major Archacki states that before Mayor Linder and Defendant Bail took office, he had been instructed "not to become involved in any controversies concerning parking near the stadium on privately owned lots." The affidavit further states that at the start of the 2012 soccer season, under Mayor Linder and Defendant Bail, "the prior policy of non-involvement with private parking lots was entirely reversed." According to Major Archacki, on game day, Defendant Bail would stand above the top wall of the stadium

and direct officers to close entrances to private parking lots near the stadium. This same policy was "re-instituted" for the 2013 soccer season. Major Archacki declares that after the first two games of the 2013 season, he approached his direct supervisor, Officer Darren Alston, and stated that he had "serious concerns about using [his] position as an officer of the City to adversely affect one private business to the advantage of another private business." Officer Alston went to Defendant Bail and "present[ed] him with a written memo." Major Archacki states that within weeks, he was demoted "without any explanation" and removed from the payroll of Defendant Global Spectrum, as were Officer John Gretsky and Officer Alston. The officers who replaced those three were "immediately placed on the payroll of [Defendant] Global Spectrum." (Id. ¶¶ 34-41; Id., Ex. F.)

Plaintiffs' original Complaint pled two federal causes of action—a Racketeer Influence and Corrupt Organizations Act ("RICO") claim under 18 U.S.C. §§ 1961, et seq. (Count I), and a civil rights procedural due process claim pursuant to 42 U.S.C. § 1983 ("Section 1983") (Counts II and III)—as well as numerous state law claims (Counts IV-VII). As noted above, each set of Defendants filed a motion to dismiss the original Complaint. I dismissed Count I against Mayor Linder on December 11, 2015. On April 19, 2016, I granted all of the pending motions: (1) dismissing Count I against Defendant Bail, the Keystone Defendants, and the Global Spectrum Defendants without prejudice, allowing Plaintiffs to file a motion for leave to amend the complaint as to the RICO claim against those Defendants; (2) dismissing Counts II and III against all Defendants with prejudice; (3) dismissing Counts IV-VII against Mayor Linder with prejudice; and (4) dismissing Counts IV-VII against the Global Spectrum Defendants without prejudice, allowing Plaintiffs to include these claims in a proposed amended complaint to be

3

filed with their motion for leave to file an amended complaint. The claims against the City Defendants were dismissed with prejudice.

More specifically, I ruled that the RICO allegations in Count I against Defendant Bail, the Keystone Defendants, and the Global Spectrum Defendants should be dismissed for failure to adequately plead a predicate act and an "enterprise." I found that Plaintiffs had not sufficiently alleged a connection between the payments to Defendant Bail and the parking lot closures, and thus had failed to plead the predicate act of bribery.

After receiving permission to do so, Plaintiffs filed their first Amended Complaint on June 7, 2017, again alleging a RICO claim against all Defendants (Count I), as well as state claims for civil conspiracy, fraud trespass, and intentional interference with contractual relations against the Global Spectrum Defendants (Counts II-V).

Defendant Bail, the Keystone Defendants, and the Global Spectrum Defendants have again filed motions to dismiss the Amended Complaint in its entirety. Plaintiffs have responded to those motions, and the Keystone Defendants and the Global Spectrum Defendants have filed reply briefs.

## II.　LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. To determine the sufficiency of a complaint under Twombly and Iqbal, the Court must take the following three steps: (1) the Court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the

4

assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

## III. ANALYSIS

### A. The RICO Claim

Plaintiffs bring a RICO claim against Defendant Commissioner Bail, the Keystone Defendants, and the Global Spectrum Defendants. Defendants assert that Plaintiffs have failed to sufficiently allege any of the RICO elements. Additionally, the Keystone Defendants and the Global Spectrum Defendants contend that the Noerr-Pennington doctrine bars the imposition of liability on them.

Section 1962(c) of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In order to state a RICO claim, the complaint must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985).

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The United States Supreme Court has established an expansive understanding of this definition, observing that "[t]he [RICO] statute does not specifically define the outer boundaries of the 'enterprise' concept," and that "this enumeration of included enterprises is obviously broad, encompassing 'any . . . group of

individuals associated in fact.'" Boyle v. U.S., 556 U.S. 938, 944 (2009) (quoting § 1961(4)) (emphasis in Boyle); see also In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 366 (3d Cir. 2010) ("[T]he Boyle Court highlighted several elements of the RICO statute that pointed toward a capacious construction of the term.").

Here, Plaintiffs allege the existence of an association-in-fact enterprise. This type of enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to pursue the enterprise's purpose." In re Ins. Brokerage Antitrust Litig., 618 F.3d at 366 (quoting Boyle, 556 U.S. at 946). While this "enterprise" element remains distinct from the "racketeering activity" element, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" Id. at 368 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). In this regard, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer existence of an association-in-fact enterprise." Id. (quoting Boyle, 556 U.S. at 951). Because Plaintiffs do not allege an ascertainable structure which is wholly distinct from the racketeering activity, I will focus my "enterprise" analysis by reviewing the pled facts alleging a "pattern of racketeering activity."

"Racketeering activity," as defined by the RICO statute, is not so much a definition as a list of offenses that can serve as a predicate offense for establishing a RICO claim. Included in this list is "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year; . . . [and] any act which is indictable under [] the following provisions of title 18 United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . [and] section 1951 (relating to interference with commerce, robbery, or extortion)." 18 U.S.C. § 1961(1). Further, and pursuant to the RICO

statute, a "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." Id. § 1961(5).

Plaintiffs advance the following predicate acts: (1) bribery chargeable under state law; (2) conduct indictable under the Hobbs Act, 18 U.S.C. § 1951; (3) mail fraud indictable under 18 U.S.C. § 1341; and (4) wire fraud indictable under 18 U.S.C. § 1343. Defendants all argue that Plaintiffs have failed to sufficiently plead any of these predicate acts. In particular, they urge that despite the incorporation of Major Archacki's affidavit, Plaintiffs have failed to cure the defect discussed in my April 19, 2016 Order—that is, a deficiency in facts supporting a nexus between the payments and parking lot closures to demonstrate bribery. Because I conclude that Plaintiffs have insufficiently alleged a Hobbs Act violation, mail fraud, or wire fraud, I need not address whether they have cured their pleadings as to bribery.

Plaintiffs contend that the payments to Defendant Bail constitute the predicate act of extortion in violation of the Hobbs Act. Subsection (b)(2) of the Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The United States Court of Appeals for the Third Circuit has observed that "[i]n order to plead extortion under color of official right, one must allege that the [d]efendant misused official government power or threatened to misuse that power in order to obtain something of value from the victim." St. Clair v. Citizens Fin. Grp., 340 F. App'x 62, 67 (3d Cir. 2009) (citing United States v. Mazzei, 521 F.2d 639, 643 (3d Cir. 1975)). In Mazzei, for example, the defendant, a state senator, approached an office space proprietor seeking a location for offices for state executive agencies. He told the proprietor that "it was the practice on all state leases that [] ten per cent of the gross

7

amount of rentals would be paid to a senate finance re-election committee," with which the proprietor complied. 521 F.2d at 640-41. The Third Circuit concluded there was sufficient evidence that the payments made by the proprietor were induced by an exploitation of his reasonable belief that the defendant's official title provided him with control over state leases, and thus the inducement was "under color of official right." Id. at 645.

Here, Plaintiffs allege that Defendant Bail "a public official, committed extortion under color of official right in violation of the Hobbs Act . . . when he accepted regular, direct payments of $400.00 as well as free box tickets, parking and food for himself and his guests." (Am. Compl. ¶ 87.) But these facts do not state a claim for extortion under color of official right. According to Plaintiffs, the Keystone Defendants and Global Spectrum Defendants, who were allegedly involved in a conspiracy with Defendant Bail against Plaintiffs, provided Defendant Bail with the payments and free items. As pled, the Keystone Defendants and Global Spectrum Defendants are thus alleged to be both co-conspirators and victims. It makes little sense that the Keystone Defendants and the Global Spectrum Defendants could be "victims," as Plaintiffs list them as co-defendants. In order for Plaintiffs to state a claim of extortion under color of official right it is Plaintiffs from whom Defendant Bail would have to have obtained something of value—not the Keystone Defendants and the Global Spectrum Defendants.

Plaintiffs next assert they have sufficiently alleged the predicate acts of mail and wire fraud. They contend that the following facts constitute mail fraud: Defendant Bail sent a letter to Mayor Linder on April 16, 2012 (Am. Compl., Ex. D); Defendant Debusschere sent a letter to Mayor Linder on April 18, 2012 (Id., Ex. C); Defendant Debusschere sent a letter to Mayor Linder, members of the Chester City Council, and Defendant Bail on March 12, 2013 (Id., Ex. M); Defendant Debusschere sent a letter to Mayor Linder and Defendant Bail on March 20, 2013

8

(Id., Ex. N); Defendant Bail caused violation notices to be issued to Plaintiffs on April 26, 2012 and June 7, 2012 (Id., Exs. E & H). Plaintiffs urge that the $400 payments through "interstate wires" to Defendant Bail constitute wire fraud.

Both mail and wire fraud entails "(1) a scheme to defraud, (2) use of the mail or interstate wires to further that scheme, and (3) fraudulent intent." Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc., 87 F. App'x 227, 231 (3d Cir. 2003). "Where acts of mail and wire fraud constitute the alleged predicate racketeering acts, those acts are subject to the heightened pleading requirement of Rule 9(b)." Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002) (citing Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 657-78 (3d Cir. 1998)). To satisfy rule 9(b), "plaintiffs must plead with particularity the 'circumstances' of the alleged fraud in order to place the defendant on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004) (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)). Plaintiffs also must allege "who made a misrepresentation to whom and the general content of the misrepresentation." Id. at 224.

For mail fraud, the complaint must "identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation." Bonavitacola, 87 F. App'x at 231 (quoting Annulli v. Panikkar, 200 F.3d 189, 201 n.10 (3d Cir. 1999)). "While innocent mailings . . . may supply the necessary communication element for these criminal offenses, there must be some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 364 (3d Cir. 2003) (internal quotation marks omitted).

9

Plaintiffs' Amended Complaint fails at the first element of mail and wire fraud. Under Pennsylvania law, a claim for fraud requires "(1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient on the misrepresentation and (5) damage to the recipient as the proximate result." Greenberg v. Tomlin, 816 F. Supp. 1039, 1054 (E.D. Pa. 1993) (citing Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991)). Here, Plaintiffs have not alleged any misrepresentation made to them, and thus have not "pled with particularity the 'circumstances' of the alleged fraud." See Lum, 361 F.3d at 223. Plaintiffs do not explain how the letters sent between Defendants contain misrepresentations made to Plaintiffs. And although Plaintiffs contend the violation notices were sent at the direction of Defendant Bail "acting in furtherance of the Defendants' RICO enterprise," they do not allege that these notices contained misrepresentations. Unlike a scheme where a plaintiff alleges that defendants misrepresented the market potential of various products to induce that plaintiff to continue investing in a project, see Devon IT, Inc. v. IBM Corp., 805 F. Supp. 2d 110 (E.D. Pa. 2011), or a scheme where a defendant rolls back the odometer of a car and advertises the car to the plaintiff as having low mileage, see Schmuck v. United States, 489 U.S. 705 (1989), no misrepresentation intended to deceive Plaintiffs is alleged here.[3] Plaintiffs' Amended Complaint falls short of the heightened requirements of Rule 9(b), and as such, fails to sufficiently plead either mail or wire fraud. See

---

[3] Plaintiffs cite to United States v. Jamieson, 427 F.3d 394 (6th Cir. 2005) in support of their contention that they have stated a scheme to defraud. There, Jamieson was charged with and convicted of defrauding investors and insurance companies by "trading in fraudulent life insurance policies and making material misrepresentations as to the nature of the policies and the escrow services the investors would receive."

Plaintiffs also cite to Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393 (6th Cir. 2012). In that case, multiple sets of plaintiffs alleged that the defendant represented that babies were available for adoption, and later, once money had been exchanged, indicated in one way or another that the adoptions had fallen through.

In both of those cases, fraudulent misrepresentations were clearly alleged, which is not the case here.

Young v. W. Coast Indus. Relations Ass'n, Inc., 763 F. Supp. 64, 71 (D. Del. 1991), aff'd, 961 F.2d 1570 (3d Cir. 1992) (dismissing RICO claim premised on mail fraud where plaintiffs did not allege acts or omissions calculated to deceive).

Because I find that Plaintiffs have not sufficiently alleged a Hobbs Act violation, mail fraud, or wire fraud, this leaves only bribery under state law as a possible predicate act. But even if Plaintiffs have plausibly alleged sufficient facts regarding bribery, this amounts to only one predicate act and is insufficient to establish a pattern of racketeering. For these reasons, I will dismiss Plaintiffs' RICO claim for failure to adequately allege a pattern of racketeering and an "enterprise."

### B. State Law Claims

Plaintiffs have also brought state law claims for civil conspiracy (Count II), fraud (Count III), trespass (Count IV), and intentional interference with contractual relations (Count V) against the Global Spectrum Defendants.

A district court may decline to extend supplemental jurisdiction over a state law claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Whether supplemental jurisdiction will be extended under these circumstances is discretionary. Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009). Ordinarily, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Here, I have dismissed Plaintiffs' only federal claim. As such, the interests of judicial economy, convenience, fairness, and comity will not be served by extending supplemental

jurisdiction over the state law claims against the Global Spectrum Defendants. Therefore, these claims are dismissed.

## IV. CONCLUSION

Plaintiffs' RICO claim is dismissed as insufficiently pled. I have already given Plaintiffs an opportunity to amend this claim and will thus dismiss this claim with prejudice. I also decline to exercise supplemental jurisdiction over Plaintiffs' state law claims against the Global Spectrum Defendants and therefore also dismiss those claims with prejudice.

An appropriate Order follows.